# DUR-A-FLEX, INC. *v.* SAMET DY
## (SC 20821)
## (SC 20823)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Alexander and Elgo, Js.

*Syllabus*

Pursuant to statute (§ 35-51 (b) (2) (B) (iii)), "misappropriation" of a trade
secret is defined in relevant part as the "use of a trade secret of another
without express or implied consent by a person who . . . at the time
of . . . use, knew or had reason to know that his knowledge of the
trade secret was . . . derived from or through a person who owed a
duty to the person seeking relief to maintain its secrecy or limit its
use . . . ."

The plaintiff, which develops, manufactures and sells resinous flooring sys-
tems, sought to recover damages from the individual defendants J, K,
L, S, and the corporate defendants A Co., D Co., E Co., I Co., M Co.,
and P Co., in connection with their alleged misappropriation of the
plaintiff's trade secrets. S was employed by the plaintiff as a research
chemist and helped develop a product known as Poly-Crete. Several
years after hiring S, who was an at-will employee, the plaintiff required
him to sign a noncompete agreement as a condition of his continued
employment. The noncompete agreement prohibited S from disclosing
or using any of the plaintiff's trade secrets and from competing with
the plaintiff for two years following the termination of his employment.
Although S signed the agreement, he then established his own floor

Dur-A-Flex, Inc. *v.* Dy

coating business, A Co., before resigning from his employment with the plaintiff. S also constructed a laboratory, where he developed formulas for flooring systems, and hired J as an assistant. After resigning, S contacted K, the president of E Co., a floor installation company and longtime customer of the plaintiff. E Co. agreed to test S's products in exchange for a discount on future purchases, but all of S's products that E Co. tested had significant problems. S also agreed to act as a consultant for I Co., which installs a flooring system known as Indu-Crete, for a monthly fee. I Co. did not manufacture its own resin and hardener at the time but was interested in doing so. S and J eventually developed and provided I Co. with an Indu-Crete formula, and they also developed for A Co. a product known as ProKrete, which D Co., a floor installation company owned by L, began using for some of its projects. Thereafter, M Co. allowed S and A Co. to produce their products on its premises, without charging them rent. Subsequently, S transferred A Co. to L, who renamed it P Co. When the plaintiff learned of S's activities, it brought the present action, claiming, inter alia, that S had breached the noncompete agreement and his common-law duty of confidentiality to the plaintiff, that each defendant had misappropriated the plaintiff's trade secrets in violation of the Connecticut Uniform Trade Secrets Act (CUTSA) (§ 35-50 et seq.), that J, L, S, A Co., and M Co. had engaged in malicious misappropriation, and that J, K, L, A Co., D Co., E Co., M Co., and P Co. had engaged in civil conspiracy. Thereafter, a bench trial was conducted in three phases. In phase one, the trial court concluded that the formulas for the resin and hardeners that the plaintiff had used in the manufacture of Poly-Crete and certain other products and processes were trade secrets, and that the noncompete agreement was unenforceable for lack of consideration. The trial court also concluded that the plaintiff's claim for breach of the common-law duty of confidentiality was preempted by CUTSA. In phase two, the trial court concluded that J, L, S, A Co., D Co., and P Co. had misappropriated the plaintiff's trade secrets in creating ProKrete and a product known as ProSpartic but that K, E Co., I Co., and M Co. had not misappropriated the plaintiff's trade secrets. The court also concluded that it could not maintain jurisdiction over K, E Co., I Co., and M Co. for purposes of enjoining their future use of the plaintiff's trade secrets because they had not engaged in any wrongful conduct. The court subsequently granted K and E Co.'s motion for attorney's fees pursuant to statute (§ 35-54) on the ground that the plaintiff had brought its claims against them in bad faith. In phase three, the trial court considered damages and remedies. The court ordered J, L, S, A Co., D Co., and P Co. to disgorge the profits that they had wrongfully gained as the result of their misappropriation of the plaintiff's trade secrets and enjoined them from manufacturing the products that they had developed using the trade secrets until the trade secrets cease to exist. During the course of the litigation, the trial court also granted a motion for summary judgment filed by K, L, D Co., E

Dur-A-Flex, Inc. *v.* Dy

Co., M Co., and P Co. on the plaintiff's civil conspiracy claims, concluding that those claims were preempted by CUTSA, and sanctioned the plaintiff for the attempted spoilation of evidence by the plaintiff's president, F. From the trial court's judgment, L, D Co., and P Co. appealed, and the plaintiff filed a separate appeal and a cross appeal.

*With respect to the plaintiff's appeal, held*:

1. The plaintiff could not prevail on its claim that the trial court had incorrectly concluded that K, E Co., I Co., and M Co. did not misappropriate the plaintiff's trade secrets in violation of CUTSA:

a. The trial court's finding that I Co. did not "use" the plaintiff's trade secrets, for purposes of § 35-51 (b) (2) (B) (iii), when it manufactured Indu-Crete using S's formula was not clearly erroneous:

After considering case law and other authorities construing the term "use" and the factors that courts have considered in determining whether a defendant has wrongfully used a trade secret, this court concluded that the uncontested evidence in the record supported the trial court's conclusion that S primarily used his independent skills and knowledge to develop the Indu-Crete formula and that his knowledge of the specific Poly-Crete formula was not a substantial, contributing factor.

Contrary to the plaintiff's contention, the trial court's finding that S used the plaintiff's trade secrets to accelerate the development of Indu-Crete, combined with its finding that ProKrete embodied the Poly-Crete formula because S used his knowledge of the Poly-Crete formula to accelerate the development of ProKrete, did not necessarily compel the conclusion that Indu-Crete embodied the Poly-Crete formula, as the trial court distinguished the development of ProKrete, which it found embodied the plaintiff's trade secrets, from the development of Indu-Crete, which it found did not, on the ground that Indu-Crete, unlike ProKrete, did not substantially derive from the plaintiff's trade secrets.

Moreover, this court was not persuaded by the plaintiff's contention that the trial court's finding that S used the plaintiff's trade secrets to accelerate the development of Indu-Crete was dispositive because any use of a trade secret as a starting point or to accelerate the development of a product constitutes "use" for purposes of CUTSA, as none of the cases that the plaintiff cited held that the substantial derivation standard is inapplicable to starting point or acceleration claims.

Furthermore, the plaintiff's contention that the trial court should not have applied the doctrine of independent development to conclude that I Co. did not use the plaintiff's trade secrets inasmuch as I Co. had never raised that doctrine as a special defense was grounded on an incorrect premise, as the court did not implicitly conclude that I Co. and the plaintiff followed separate and independent routes to the same destination but,

Dur-A-Flex, Inc. *v.* Dy

rather, that the Indu-Crete and Poly-Crete formulas were substantially different destinations.

b. The trial court's finding that K, E Co., and M Co. did not know or have reason to know that S had misappropriated the plaintiff's trade secrets was not clearly erroneous:

With respect to K and E Co., the evidence that they knew that S had been employed by the plaintiff, that S had provided them with a formula within weeks of leaving his employment with the plaintiff, and that they had been added as defendants in the present action did not compel the conclusion that they knew or should have known that S had misappropriated the plaintiff's trade secrets, and the trial court was free to credit the evidence demonstrating that K was not in a position to compare the various formulas and K's testimony that he believed S's statement that S had not used the plaintiff's formulas, which testimony was bolstered by evidence indicating that the products that S had provided to E Co. had significant problems.

Moreover, the trial court was free to draw an inference from a letter that K had written to the court, in which he stated that he reasonably believed that S had used publicly available sources to develop the formula for ProKrete.

With respect to M Co., evidence that its president knew that S had been employed by the plaintiff and had developed Poly-Crete did not compel the conclusion that he knew or should have known that S had misappropriated the plaintiff's trade secrets, as the trial court was free to credit the evidence that M Co.'s president was not in a position to know whether the ProKrete formula had been derived from the Poly-Crete formula, as well as testimony that S had denied using the plaintiff's formulas and that the first formulas that S provided had performed poorly, which would not have been the case if they had been substantially derived from the Poly-Crete formula.

2. The plaintiff could not prevail on its claim that the trial court had improperly granted the motion for summary judgment on the civil conspiracy claims as to K, E Co., and M Co.:

a. The plaintiff's claim that it was procedurally improper for the trial court to consider the motion for summary judgment during trial because it was filed long after the summary judgment deadline had expired, and because the plaintiff was not in agreement that such a motion should be heard or considered, was unavailing:

The case law on which the plaintiff relied was not controlling because the trial court did not act sua sponte but, rather, ruled on a written motion for summary judgment filed by the defendants, the plaintiff had

Dur-A-Flex, Inc. *v.* Dy

notice of that motion and filed an objection thereto, and the court heard argument on the issue.

Moreover, because the defendants effectively complied with the rule of practice (§ 17-44) requiring a party to seek the trial court's permission to file a summary judgment motion, and because the plaintiff had an opportunity to respond to the motion, the trial court did not abuse its discretion when it considered and granted the motion.

b. The plaintiff could not prevail on its claim that the trial court, in granting the summary judgment motion, had incorrectly determined that the plaintiff's civil conspiracy claims against K, E Co. and M Co. were preempted by CUTSA:

The plaintiff claimed that, even if K, E Co., and M Co. did not misappropriate the plaintiff's trade secrets, they could be held liable for civil conspiracy if they knew that J, L, and S had done so and if they aided and abetted that wrongful conduct for their own benefit, but that claim failed in light of this court's conclusion that the trial court reasonably had found that K, E Co., and M Co. did not know or have reason to know that J, L, and S had misappropriated the plaintiff's trade secrets.

3. The trial court did not abuse its discretion in denying the plaintiff's request to enjoin K, E Co., I Co., and M Co. from using the plaintiff's trade secrets in the future:

With respect to I Co., this court previously held that the trial court reasonably had determined that S did not use the plaintiff's trade secrets to develop Indu-Crete, and, with respect to K, E Co., and M Co., even if they unknowingly used products that embodied the plaintiff's trade secrets in the past, the plaintiff cited no evidence that they had any intention of continuing to do so.

4. The trial court did not abuse its discretion in imposing a monetary penalty on the plaintiff and awarding attorney's fees to the defendants as sanctions for F's attempted spoilation of evidence, and the amount of the sanctions was not grossly disproportionate to the harm suffered by the defendants and the trial court:

F's misconduct, namely, attempting to have certain photographs removed from the plaintiff's Facebook page while a witness was testifying, resulted in significant confusion, aggravation, and inconvenience, interrupted the trial for two days, required the defendants' counsel to investigate whether the plaintiff had engaged in other misconduct and to brief what form of sanctions should be imposed, and was an affront to the integrity of the court.

Moreover, the facts that F's misconduct was discovered, that F was ultimately unsuccessful in his attempt to conceal the photographs, and that the defendants did not seek information about the plaintiff's Face-

Dur-A-Flex, Inc. *v.* Dy

book page through discovery before the issue arose at trial did not reduce the egregious nature of F's conduct.

5. The trial court did not abuse its discretion in awarding attorney's fees to K and E Co. pursuant to § 35-54 on the ground that the plaintiff's claims of misappropriation against them were made in bad faith:

The trial court's denial of K and E Co.'s pretrial motion for summary judgment on the ground that a reasonable fact finder might conclude that they knew or should have known that S had misappropriated the plaintiff's trade secrets did not, as the plaintiff claimed, preclude the trial court, after hearing all of the evidence and assessing its credibility and persuasiveness, from later concluding that the plaintiff had brought the claims in bad faith because it knew that there was no evidence to support them.

Moreover, the trial court's finding that the claims against K and E Co. were objectively specious, insofar as they superficially appeared to have merit but there was a complete lack of evidence to support them, was not clearly erroneous.

Specifically, the trial court found credible evidence demonstrating that all of the products that S provided to E Co. had significant problems, that K had no way of comparing the formulas developed by S with those developed by the plaintiff, that S denied having misappropriated the plaintiff's trade secrets when K confronted him, that the plaintiff's owner had represented that he saw no merit to the claims against K and E Co., and that, in a letter to the court, K expressed his belief that S had developed the formulas from information in the public domain.

Furthermore, although the trial court did not identify the specific evidence supporting its conclusion that the plaintiff had displayed a punitive attitude toward K and E Co., and that the plaintiff was retaliating against K and E Co. for their support of S, the trial court's finding that the plaintiff knew fairly early in the litigation, if not from the start, that its claims against K and E Co. were without evidentiary support, and were therefore pursued with subjective bad faith, was not clearly erroneous.

*With respect to the appeal by L, D Co., and P Co., held*:

1. The trial court incorrectly interpreted the knowledge requirement of § 35-51 (b) (2) (B) (iii) as requiring proof only that L, D Co., and P Co. knew or should have known that S misappropriated the plaintiff's trade secrets, when the plaintiff was required to prove that L himself and, through him, D Co. and P Co., had knowledge of the plaintiff's trade secrets:

Although there was a split of authority on the issue of whether a plaintiff is required to prove that a defendant had knowledge of the plaintiff's trade secret, or only that the defendant had knowledge that the trade secret was derived through improper means, a review of the relevant

Dur-A-Flex, Inc. *v.* Dy

case law led this court to conclude that the defendant's knowledge of the trade secret is an element of a claim of misappropriation under § 35-51 (b) (2) (B) (iii), that a defendant cannot "use" a trade secret for purposes of that statute if the defendant does not have knowledge of the trade secret itself, and that the defendant must actually or constructively possess the information that constitutes the trade secret, and not merely use or possess a product that embodies the trade secret but does not disclose to the defendant any material aspect of the trade secret itself.

Because the trial court's interpretation of § 35-51 (b) (2) (B) (iii) was incorrect, this court reversed that court's judgment against L, D Co., and P Co. on the misappropriation claims and remanded the case for a new trial limited to the issue of L's knowledge of the plaintiff's trade secrets.

2. L, D Co., and P Co. could not prevail on their claim that the trial court had failed to properly balance their interest in pursuing their livelihoods with the plaintiff's interest in protecting itself from unfair competition when it determined that they had misappropriated the plaintiff's trade secrets to develop ProKrete and ProSpartic:

Although this court has long recognized the competing interests of employees in being able to leave employers and to continue to work in the area of their greatest expertise and of employers in protecting their trade secrets, given the highly fact-specific nature of the determination as to whether an employee accused of misappropriation had been using his general knowledge and expertise or, instead, had been using his former employer's trade secrets, this court could not conclude that the trial court had improperly balanced the competing interests at issue.

Specifically, the trial court clearly recognized that S had the right to continue to use his general knowledge and expertise as a chemist after he left his employment with the plaintiff, and the court's finding that S had not used his general knowledge but, instead, had misappropriated the plaintiff's trade secrets and used them to develop the formulas for ProKrete and ProSpartic was amply supported by the evidence.

3. The plaintiff identified its trade secrets with sufficient particularity in its complaint and in its responses to certain interrogatories:

L, D Co., and P Co. failed to demonstrate how the plaintiff's pleadings did not satisfy the requirement that the trade secret be defined with sufficient particularity to put the court and the defendants on notice of what was claimed to have been misappropriated, and the mere fact that the plaintiff identified an additional formula as a trade secret in its amended complaints and provided greater detail in its responses to interrogatories did not make the trade secret a moving target, deprive the defendants of the information they needed to defend themselves, or prevent the trial court from managing the discovery process effectively and efficiently.

Dur-A-Flex, Inc. *v.* Dy

4. The trial court applied an incorrect standard in determining the appropriate remedies for the misappropriation of the plaintiff's trade secrets by L, D Co., and P Co.:

The trial court ordered L, D Co., and P Co. to disgorge the profits from the sale of ProKrete and ProSpartic and enjoined them from manufacturing those products until the trade secrets on which those products were based cease to exist, and it declined their request to limit damages to the head start period, which is the period of time that the proprietary information would have remained unavailable to the defendants in the absence of the appropriation, on the ground that they did not use the plaintiff's trade secrets as a starting point for or to accelerate the development of a new product when, instead, ProKrete and ProSpartic were substantially derived from the plaintiff's trade secrets.

After reviewing the relevant authorities, however, this court concluded that, except in certain limited circumstances not present in this case, monetary and injunctive relief for the misappropriation of trade secrets is appropriate only for the head start period, regardless of whether the defendant used the trade secret to accelerate the development of a new product or whether a new product substantially embodied the trade secret, and applying the head start concept when the trade secret is substantially embodied in the new product was also consistent with the language of the injunctive relief statute (§ 35-52).

Accordingly, the trial court applied an incorrect standard when it determined that the head start concept did not apply because L, D Co., and P Co. did not use the plaintiff's trade secrets as a starting point to develop something new, and, if the court concludes on remand that those defendants are liable for misappropriation, it must then determine the amount of damages and the extent of the injunctive relief, if any, applying the correct standard.

5. L, D Co., and P Co. could not prevail on their claim that the injunctive relief afforded by the trial court, namely, an order prohibiting the manufacture, sale, or distribution of any product made with a formula that has an essentially identical form as the ProKrete formula, was impermissibly vague and restrictive:

Although this court recognized the difficulties inherent in determining whether formulas are sufficiently similar to support a finding that a trade secret has been used, it determined that those difficulties are simply unavoidable in this context, and this court declined to conclude that the principle that the substantial use of a trade secret constitutes misappropriation could not be applied to the commercial activities of L, D Co., and P Co.

*With respect to the plaintiff's cross appeal, held*:

Dur-A-Flex, Inc. *v.* Dy

1. This court declined to review the plaintiff's claim that the trial court had improperly limited the testimony of the plaintiff's damages expert, as the plaintiff failed to identify where in the voluminous record the trial court's ruling on this issue could be found.

2. The trial court incorrectly determined that the plaintiff's noncompete agreement with S was unenforceable for lack of consideration, and, accordingly, this court reversed the trial court's judgment with respect to the plaintiff's breach of the noncompete agreement claim and remanded the case for further proceedings to determine whether S received adequate consideration in exchange for executing the noncompete agreement and, if so, whether S breached the agreement:

   Under *Roessler* v. *Burwell* (119 Conn. 289), a promise of indefinite, continued employment for an at-will employee in exchange for the employee's promise not to compete constitutes adequate consideration to form an enforceable agreement, and, because none of the parties asked this court to overturn or modify *Roessler*, the trial court's conclusion in the present case that an at-will employee's continued employment can never constitute consideration for a noncompete agreement was incorrect.

   Nonetheless, the plaintiff in the present case never explicitly promised S that it would continue to employ him for any particular period, the trial court did not evaluate whether the noncompete agreement imposed an obligation on the plaintiff that would make the agreement enforceable, and, because the plaintiff's forbearance of its right to terminate S's employment could constitute valid consideration if it altered S's at-will status, further proceedings were necessary to determine whether the plaintiff provided adequate consideration.

3. The trial court correctly determined that CUTSA preempted the plaintiff's claim that S had violated his common-law duty of confidentiality:

   A review of the relevant provisions of CUTSA, the Uniform Trade Secrets Act, and, in particular, the provision (§ 35-57 (a)) of CUTSA that provides that claims for the misappropriation of trade secrets are governed solely by CUTSA led this court to conclude that CUTSA preempts noncontractual civil claims against a former employee based on the acquisition, disclosure, or use of confidential information that does not rise to the level of a trade secret, and the two tiered system of liability advocated by the plaintiff, pursuant to which plaintiffs may bring claims under CUTSA for the alleged misappropriation of trade secrets and common-law claims for the alleged misuse of other confidential information, was inconsistent with the preemption clause in § 35-57 (a).

   Moreover, this court determined that its dictum in *Allen Mfg. Co.* v. *Loika* (145 Conn. 509) suggesting that a former employee has a common-

Dur-A-Flex, Inc. *v.* Dy

law duty to maintain the confidentiality of information that does not constitute a trade secret no longer reflected the current state of the law.

4. The plaintiff could not prevail on its claim that the trial court had improperly rendered judgment for L, D Co., and P Co. on the plaintiff's civil conspiracy claims on the ground that those claims were preempted by CUTSA:

After a review of case law from other states addressing whether a claim for civil conspiracy that does not fall squarely within CUTSA's prohibition on misappropriation is nevertheless preempted, this court determined that, in the absence of evidence that the alleged conspirator possessed actual or constructive knowledge of the trade secret, CUTSA, which specifies that only those who have such knowledge may be held liable for misappropriation, preempts common-law claims that dispense with that requirement, and to conclude otherwise would result in a confusing and nonuniform patchwork of statutory and nonstatutory causes of action arising from the misappropriation of trade secrets, which is the very situation that the preemption provision was intended to prevent.

In the present case, because the objective of the civil conspiracy alleged by the plaintiff was the misappropriation of the plaintiff's trade secrets, the trial court correctly determined that the plaintiff's civil conspiracy claims were preempted by § 35-57 (a).

5. The plaintiff could not prevail on its claim that the trial court had incorrectly concluded that J, L, S, D Co., and P Co. did not act maliciously in misappropriating the plaintiff's trade secrets and, therefore, that the plaintiff was not entitled to punitive damages and attorney's fees pursuant to statute (§ 35-53 (b)):

The trial court denied the plaintiff's request for punitive damages and attorney's fees on the ground that, although L and S may have disliked certain individuals associated with the plaintiff, their main motivation for the misappropriation was to make money, and the court's conclusion that L and S disliked the plaintiff did not compel the conclusion that they were motivated to misappropriate its trade secrets by a desire to injure the plaintiff.

Moreover, there was no compelling evidence in the record that any of the defendants had malicious intent, it was entirely the prerogative of the trial court to so find, and, accordingly, the court did not abuse its discretion in denying the plaintiff's request for punitive damages and attorney's fees pursuant to § 35-53 (b).

Argued September 6, 2023—officially released July 2, 2024*

* July 2, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

Dur-A-Flex, Inc. *v.* Dy

*Procedural History*

Action to recover damages for, inter alia, breach of a noncompete agreement, and for other relief, brought to the Superior Court in the judicial district of Hartford, where the case was transferred to the Complex Litigation Docket; thereafter, A&E ProCoat, LLC, et al. were added as defendants; subsequently, the court, *Sheridan, J.*, granted in part the plaintiff's motion to strike the special defenses filed by the defendant Indue Sales and Services, Inc.; thereafter, the action was withdrawn as to the defendant Polystar, LLC, et al.; subsequently, the court, *Sheridan, J.*, denied the motion for summary judgment filed by the defendant Engineered Coatings, Inc., et al.; thereafter, the first phase of the proceedings was tried to the court, *Moukawsher, J.*, which issued a ruling that the plaintiff possessed certain trade secrets; subsequently, the court, *Moukawsher, J.*, granted in part the motion for sanctions filed by the defendant Indue Sales and Services, Inc., et al.; thereafter, the second phase of the proceedings was tried to the court, *Moukawsher, J.*, which granted the motion for summary judgment filed by the defendant A&E ProCoat North America, LLC, et al. as to certain counts of the plaintiff's complaint and rendered judgment thereon; subsequently, the court, *Moukawsher, J.*; rendered judgment for the defendant Indue Sales and Services, Inc., et al.; thereafter, the plaintiff appealed to the Appellate Court; subsequently, the third phase of the proceedings was tried to the court, *Moukawsher, J.*, which rendered partial judgment for the plaintiff as to the defendants A&E ProCoat, LLC, et al.; thereafter, the court, *Moukawsher, J.*, granted in part the motion for attorney's fees filed by the defendant Engineered Coatings, Inc., et al., and granted in part the plaintiff's motion for attorney's fees; subsequently, the defendant Steven Lipman et al. appealed and the plaintiff cross appealed to the Appel-

Dur-A-Flex, Inc. *v.* Dy

late Court; thereafter, the appeals were transferred to this court. *Reversed in part*; *new trial*.

*Michael D. Blumberg*, with whom, on the brief, was *Lawrence G. Rosenthal*, for the appellant in SC 20821 and the appellee-cross appellant in SC 20823 (plaintiff).

*Proloy K. Das*, with whom were *Jonathan M. Shapiro* and, on the brief, *Lorey R. Leddy* and *Julie A. Lavoie*, for the appellants-cross appellees in SC 20823 (defendant ProRez Performance Resins and Coatings, LLC, et al.).

*Daniel J. Krisch*, with whom were *Jennifer A. Pedevillano* and, on the brief, *Joseph G. Fortner, Jr.*, for the appellee in SC 20821 (defendant Indue Sales and Services, Inc.).

*Jonathan M. Shapiro*, for the appellees in SC 20821 (defendant Engineering Coatings, Inc., et al.).

*Jeffrey O. McDonald*, for the appellee in SC 20821 (defendant Merrifield Paint Company, Inc.).

*Opinion*

ALEXANDER, J. These appeals[1] arise from a dispute over whether the defendants[2] misappropriated the trade secrets of the plaintiff, Dur-A-Flex, Inc., in violation of the Connecticut Uniform Trade Secrets Act (CUTSA), General Statutes § 35-50 et seq. After a bench trial, the trial court rendered judgment for the plaintiff on certain of its claims and for several defendants on other claims.

---

[1] The appeals were filed in the Appellate Court, and we transferred them to this court pursuant to General Statutes § 52-199 (c) and Practice Book § 65-1.

[2] The defendants are Samet Dy; A&E ProCoat, LLC; Auttdomm Dy; Koster American Corporation; Polystar, LLC; Steven Lipman; A&E ProCoat North America, LLC, now known as ProRez Performance Resins and Coatings, LLC; Durafloor Industrial Flooring & Coating, Inc.; Engineered Coatings, Inc.; Mix-it, Inc.; Merrifield Paint Company, Inc.; Christopher Krone; and Indue Sales and Services, Inc. The action was withdrawn as to Koster American Corporation, Polystar, LLC, and Mix-it, Inc.

Dur-A-Flex, Inc. *v.* Dy

The plaintiff appeals from the judgment in favor of the defendants Indue Sales and Services, Inc. (Indue), Christopher Krone, Engineered Coatings, Inc. (ECI), and Merrifield Paint Company, Inc. (Merrifield). The defendants Steven Lipman, Durafloor Industrial Flooring & Coating, Inc. (Durafloor), and ProRez Performance Resins and Coatings, LLC (ProRez), appeal from the judgment against them in favor of the plaintiff. In turn, the plaintiff cross appeals, challenging a number of adverse rulings. We conclude that the trial court incorrectly determined that the plaintiff was not required to prove that Lipman and, through him, Durafloor and ProRez, had knowledge of the plaintiff's trade secrets and used that knowledge in order to establish the elements of misappropriation under General Statutes § 35-51 (b) (2) (B) (iii). The case must therefore be remanded for a new trial limited to that issue. We further conclude that the trial court applied an incorrect standard when it crafted the monetary and injunctive relief as to Lipman, Durafloor, and ProRez. If the trial court determines on remand that those defendants had knowledge of and used the plaintiff's trade secrets, it must then apply the correct standard. Finally, we conclude that the trial court incorrectly determined that the noncompete agreement between the plaintiff and the named defendant, Samet Dy (Samet), was unenforceable because continued employment can never constitute consideration for a noncompete agreement. The judgment as to the breach of the noncompete agreement claim must therefore be reversed, and the trial court must determine on remand whether there was sufficient consideration for the noncompete agreement and, if so, whether Samet breached the agreement. We affirm the judgment of the trial court in all other respects.

The record reveals the following facts that the trial court reasonably could have found. The plaintiff is engaged in the business of developing, manufacturing,

and selling commercial and industrial flooring systems and polymer component materials. Soon after the plaintiff hired Samet as a research chemist in 2004, he began work on the development of a product known as Poly-Crete. Poly-Crete is sold in three components: a resin, a hardener, and an aggregate. The components are mixed on site, rolled or troweled into place, and then left to cure. In 2011, Samet entered into a "Noncompetition, Nonsolicitation and Confidentiality Agreement" (noncompete agreement) with the plaintiff that prohibited him from performing any services for any company that competes with the plaintiff for a period of twenty-four months from the last day of his employment with the plaintiff and from using any of the plaintiff's confidential or proprietary business information or trade secrets.

Lipman started working as a chemist for the plaintiff in 2003. In 2010, the plaintiff terminated his employment. Lipman subsequently created his own company, Durafloor, which installs flooring systems.

On January 2, 2013, Samet resigned from his employment with the plaintiff. Unbeknownst to the plaintiff, prior to the effective date of his resignation, Samet had filed articles of incorporation for the defendant A&E ProCoat, LLC (A&E). Samet also had constructed a laboratory in his garage, in which he developed formulas for flooring systems. To assist him in these endeavors, Samet hired his nephew, the defendant Auttdomm Dy (Josh), in August, 2012.

Immediately upon resigning from the plaintiff, Samet contacted Krone, ECI's vice president. ECI, a floor installation company, was a longtime customer of the plaintiff. Samet provided ECI with sample flooring products, which it agreed to test in the field in exchange for an open-ended discount on future purchases of one of the products, below the price that it was paying for similar products made by the plaintiff. All of the

Dur-A-Flex, Inc. *v.* Dy

products that ECI tested for Samet and A&E had significant problems.

In August, 2013, Tom Scanlan, the president of Indue, flew from Wisconsin, where Indue's corporate headquarters are located, to Connecticut to meet with Samet. Indue is in the business of installing a cementitious urethane flooring system known as Indu-Crete. Indue did not manufacture its own resin and hardener at the time but was interested in doing so because its supplier was about to discontinue those products. Following the visit from Scanlan, Samet executed a contract with Indue to act as a consultant for a fee of $10,000 per month.

On September 6, 2013, Samet and Josh began work on the Indu-Crete products and on a product known as ProKrete for A&E. In October, 2013, Indue received a resin formula from Samet. At some point, Durafloor began using ProKrete for some of its projects.

In February, 2014, Samet and A&E started producing products on the premises of Merrifield, a paint manufacturing company located in Rocky Hill. Merrifield did not charge rent to A&E for the use of the space. In November, 2014, Samet transferred A&E to Lipman, who renamed it A&E ProCoat North America, LLC, and, ultimately, ProRez. Lipman continued to pay Samet out of ProRez' earnings.

After learning of Samet's activities, the plaintiff brought this action, claiming that Samet had breached the noncompete agreement and his common-law duty of confidentiality; Samet, A&E, Josh, Lipman, Durafloor, ProRez, Merrifield, Krone, ECI, and Indue had misappropriated the plaintiff's trade secrets in violation of CUTSA; Samet, A&E, Josh, Lipman, and Merrifield had engaged in malicious misappropriation; and A&E, Josh, Lipman, Durafloor, ProRez, Merrifield, Krone, and ECI had engaged in civil conspiracy.

Dur-A-Flex, Inc. *v.* Dy

The bench trial was conducted in three phases: phase one, in which the trial court determined the scope of the plaintiff's trade secrets; phase two, in which the court determined whether any trade secrets had been misappropriated; and phase three, in which the court determined damages and remedies. In phase one, the court concluded that the formulas for the resin and hardeners that the plaintiff used in the manufacture of Poly-Crete and a number of other products and processes, including a "polyaspartic-imine resin" floor coating, were trade secrets. The court also concluded that the noncompete agreement was unenforceable because Samet had not received any consideration in exchange for it.[3]

In phase two, the trial court concluded that Samet, A&E, Josh, Lipman, Durafloor, and ProRez had misappropriated the plaintiff's Poly-Crete formula to create ProKrete and its polyaspartic technology to create a product known as ProSpartic. With respect to the plaintiff's CUTSA claims against Indue, Krone, ECI, and Merrifield, the court concluded that they did not misappropriate the plaintiff's trade secrets and rendered judgment in their favor.[4] The court further concluded that it could not maintain jurisdiction over Indue, Krone, ECI, and Merrifield for purposes of granting injunctive relief because they had not engaged in any wrongful conduct. The court subsequently granted Krone and ECI's motion for attorney's fees pursuant to General Statutes § 35-54 on the ground that the plaintiff had brought its claims against them in bad faith.

In phase three, the trial court concluded that the defendants who had misappropriated the plaintiff's

---

[3] The trial court later determined that Samet owed no common-law duty of confidentiality to the plaintiff.

[4] The trial court concluded, somewhat cryptically, that Samet had used the plaintiff's trade secrets to "accelerate" the development of Indu-Crete but that Indu-Crete did not "embod[y]" the trade secrets. We address this aspect of the court's decision in part I A 1 of this opinion.

Dur-A-Flex, Inc. *v.* Dy

trade secrets must disgorge the money that they wrongfully gained as the result of the misappropriation and enjoined those defendants from manufacturing the products that they had developed using the trade secrets until the trade secrets ceased to exist.

During the course of the litigation, the trial court also granted the motion for summary judgment filed by Lipman, Durafloor, ProRez, Krone, ECI, and Merrifield on the plaintiff's claims of civil conspiracy, concluding that the claims were preempted by CUTSA. In addition, the court limited the testimony of the plaintiff's expert witness and sanctioned the plaintiff for spoliating certain evidence. These appeals and cross appeal followed.

I

THE PLAINTIFF'S CLAIMS ON APPEAL

A

The plaintiff first claims that the trial court incorrectly determined that Indue, Krone, ECI, and Merrifield did not misappropriate the plaintiff's trade secrets in violation of CUTSA. We disagree.

The following additional facts are relevant to this claim. In its phase two memorandum of decision, the trial court found that all cementitious urethane floor coatings have the same three components: a resin containing polyols, a hardener, and an aggregate. In addition, the products contain surfactants, wetting agents, plasticizers, defoamers, and fillers. Creating a product that performs well in the field requires years of experimentation, observation, and trial and error to determine the proper combination of ingredients. The court also found that "the [parties' expert witnesses] . . . all agree[d] that any small chemical change in the brand of the foo foo dust [the trial court's designation for the unique components of a cementitious urethane flooring product] or its ingredients changes everything." In addi-

tion, the court found that, in developing a useful product, "[b]asic research practices, such as the use of ladder studies and good lab bookkeeping, would seem part of a basic chemist's tool kit. They even could include more sophisticated concepts, such as the notion that cementitious urethane formulas typically need defoamers, surfactants, and plasticizers. These things are too common to be trade secrets." (Internal quotation marks omitted.)

With respect to the ProKrete formula developed by Samet after he left the plaintiff, the trial court found that it contained many of the same ingredients as those that were contained in the plaintiff's Poly-Crete formula. The court also found that the fact that Josh had been able to complete the ProKrete formula in a little more than one year, in contrast to the eight years that it took the plaintiff to develop Poly-Crete, showed that he had used Samet's knowledge of the Poly-Crete formula.

During the trial, the parties conducted a comparative demonstration of Poly-Crete, Indu-Crete, and ProKrete at a warehouse. The trial court concluded that Poly-Crete and ProKrete were "remarkably similar in appearance and performance." On the basis of this and other evidence, the court concluded that Samet had misappropriated the Poly-Crete formula and "embedded it in ProKrete."

The trial court reached a different conclusion with respect to the Indu-Crete formula that Samet had developed for Indue. The court found that Indu-Crete contained six ingredients that were not contained in the Poly-Crete formula, that Poly-Crete contained ten ingredients that were not contained in Indu-Crete, and that some shared ingredients were used for different purposes. The court also found that Indu-Crete was specifically created for Indue's particularized needs and designed

to be used with Indue's own aggregate. Samet provided seven different batches of the product before the eighth batch finally satisfied Indue's requirements. During the comparative demonstration, the court observed that Indu-Crete and Poly-Crete behaved very differently.

On the basis of this evidence, the trial court found that, "[u]nlike ProKrete, Indu-Crete is not substantially the same formula created in substantially the same way for substantially the same purpose as Poly-Crete" and concluded that, based on "the totality of the circumstances, it [was] not enough of a match to call using Indu-Crete using [the plaintiff's] trade secrets."

The trial court further concluded that, even if Samet and Josh had engaged in "research chicanery" when they developed the Indu-Crete formula, Indue had no reason to know about it. The court based this conclusion on credible evidence that Scanlan had explained Indue's need for a product with very specific characteristics to Samet when he was hired, had warned Samet "not to use anyone else's information improperly," and had no knowledge of the formula for Poly-Crete.

With respect to ECI, Krone, and Merrifield, the trial court concluded that none of them was liable under CUTSA because they did not know or have reason to know that Samet was using the plaintiff's trade secrets to develop his products. Specifically, there was no evidence that Krone and ECI had sufficient knowledge of the plaintiff's formulas to know that they were embodied in the products that Samet was selling. Similarly, Merrifield was not in a position to compare the formulas that Samet provided with the plaintiff's formulas, and, in any event, the products that Samet provided to Merrifield were performing poorly. In addition, Merrifield's owner, Douglas Merrifield, had warned Samet that he did not want to be involved with him if he was misappropriating information, and Samet had assured him that

Dur-A-Flex, Inc. *v.* Dy

he could make a product in an entirely different way than the plaintiff.

The trial court summarized its holdings by stating that Samet, Josh, and Lipman "used [the plaintiff's] trade secrets to accelerate [the] development of Pro-Krete . . . and Indu-Crete" and that "[t]hose trade secrets are embodied in ProKrete . . . but not in Indu-Crete."

On appeal, the plaintiff contends that the trial court's conclusion that Indue did not use the plaintiff's trade secrets was inconsistent with its conclusion that Samet had used the plaintiff's trade secrets to accelerate the development of Indu-Crete and that the trial court effectively applied the doctrine of independent development, even though Indue had never raised that doctrine as a special defense. It further contends that, in concluding that Indue had no reason to know that Samet used the plaintiff's trade secrets in developing Indu-Crete, the trial court ignored evidence showing that Scanlan knew that Samet had worked for the plaintiff, Samet developed the Indu-Crete formula within months of being hired by Indue, the plaintiff's president, Ferris, called Scanlan during the summer of 2015 regarding Samet's potential theft of the plaintiff's trade secrets, and the plaintiff served Indue with the complaint in this action shortly thereafter. With respect to Krone, ECI, and Merrifield, the plaintiff contends that evidence presented at trial compels the conclusion that they knew or should have known that the products that Samet provided to them had been developed through the misappropriation of the plaintiff's trade secrets.

1

We first address the plaintiff's claims relating to Indue. We conclude that the trial court's finding that Indue did not use the plaintiff's trade secrets when it used Samet's formula to manufacture Indu-Crete was

Dur-A-Flex, Inc. *v.* Dy

not clearly erroneous.[5] We therefore need not address the plaintiff's claim that the trial court incorrectly determined that Indue had no reason to know that Samet used its trade secrets to develop Indu-Crete.

We begin by setting forth the standard of review and the governing legal principles. Whether Indue used trade secrets belonging to the plaintiff that it acquired through Samet is a mixed question of law and fact. We therefore "review the subsidiary findings of historical fact, which constitute a recital of external events and the credibility of their narrators, for clear error, and engage in plenary review of the trial court's application of . . . legal standards . . . to the underlying historical facts." (Internal quotation marks omitted.) *Iacurci* v. *Sax*, 313 Conn. 786, 797 n.12, 99 A.3d 1145 (2014).

Section 35-51 (b) (2) defines "misappropriation" in relevant part as "use of a trade secret of another without express or implied consent by a person who . . . (B) at the time of . . . use, knew or had reason to know that his knowledge of the trade secret was . . . (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . . ."[6]

---

[5] In reaching this conclusion, we focused on whether Samet used the Poly-Crete formula to develop the Indu-Crete formula because Indue does not dispute that, if that were the case, then it used the plaintiff's trade secrets.

[6] We note that the only CUTSA provision that the trial court expressly cited in its phase two memorandum of decision was § 35-51 (b) (2) (B) (ii), which defines misappropriation as the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . *acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use* . . . ." (Emphasis added.) This provision applies to Samet's conduct, not to the conduct of Indue and the other defendants who are alleged to have derived the plaintiff's trade secrets through Samet. We presume that the trial court applied the proper provision of the statute, namely, § 35-51 (b) (2) (B) (iii), to those defendants. See, e.g., *State* v. *Henderson*, 312 Conn. 585, 598, 94 A.3d 614 (2014) ("this court presumes that the trial court properly applied the law in the absence of evidence to the contrary").

Dur-A-Flex, Inc. *v.* Dy

The term "use," as used in § 35-51 (b) (2) (B) (iii), is not statutorily defined, but the principles set forth in the Restatement (Third) of Unfair Competition are "intended to be consistent with and applicable to actions under the Uniform Trade Secrets Act [UTSA]." Restatement (Third), Unfair Competition, Appropriation of Trade Values § 40, comment (a), p. 453 (1995). According to the Restatement (Third), "[t]here are no technical limitations on the nature of the conduct that constitutes 'use' of a trade secret . . . . As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use' under this [s]ection. Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret . . . all constitute 'use.' " Id., comment (c), p. 455; see also *On-Line Technologies, Inc.* v. *Perkin-Elmer Corp.*, 253 F. Supp. 2d 313, 323 (D. Conn. 2003) (under CUTSA, "a trade secret is used if it has contributed to the acceleration of the introduction of the product" (internal quotation marks omitted)), vacated in part on other grounds sub nom. *On-Line Technologies, Inc.* v. *Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133 (Fed. Cir. 2004).[7]

"The unauthorized use need not extend to every aspect or feature of the trade secret; use of any substantial portion of the secret is sufficient to subject the actor to liability. Similarly, the actor need not use the trade secret in its original form. Thus, an actor is liable for

[7] When this court construes uniform acts, it seeks guidance from the case law of other jurisdictions that have adopted similar provisions of the uniform act. See, e.g., *Friezo* v. *Friezo*, 281 Conn. 166, 188, 914 A.2d 533 (2007), overruled in part on other grounds by *Bedrick* v. *Bedrick*, 300 Conn. 691, 17 A.3d 17 (2011); see also General Statutes § 35-58 ("[t]his chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it").

Dur-A-Flex, Inc. *v.* Dy

using the trade secret with independently created improvements or modifications if the result is substantially derived from the trade secret. . . . [I]f the contribution made by the trade secret is so slight that the actor's product or process can be said to derive from other sources of information or from independent creation, the trade secret has not been 'used' for purposes of imposing liability . . . .'' Restatement (Third), supra, § 40, comment (c), pp. 455–56; see also *Mangren Research & Development Corp.* v. *National Chemical Co.*, 87 F.3d 937, 944 (7th Cir. 1996) (under Illinois Trade Secrets Act, 765 Ill. Comp. Stat. Ann. 1065/1 et seq., user who modifies or improves another's trade secret may still be liable for misappropriation if ''the substance of the process . . . is derived from the other's [trade] secret'' (internal quotation marks omitted)); 4 R. Milgrim & E. Bensen, Milgrim on Trade Secrets (2020) § 15.01 [1] [d] [vi], p. 15-256 (''a plaintiff may prevail on a trade secret claim by establishing that [the] defendant used [the] plaintiff's trade secret as the helpful starting point for [the] defendant's own development efforts'').

A number of courts have observed that plaintiffs attempting to establish that a trade secret has been used or disclosed often face a difficult task. See, e.g., *Eden Hannon & Co.* v. *Sumitomo Trust & Banking Co.*, 914 F.2d 556, 561–62 (4th Cir. 1990), cert. denied, 499 U.S. 947, 111 S. Ct. 1414, 113 L. Ed. 2d 467 (1991). The reasons for this are twofold. First, the misappropriation of trade secrets can be difficult to prove because the cases often depend on ambiguous and circumstantial evidence. See, e.g., id., 561. Second, although the UTSA embodies the important public policy of protecting trade secrets in order ''to maintain standards of commercial ethics and to encourage research and innovation''; *Fleming Sales Co.* v. *Bailey*, 611 F. Supp. 507, 511 (N.D. Ill. 1985); plaintiffs confront an ''equally strong policy against inhibiting competition in the mar-

Dur-A-Flex, Inc. *v.* Dy

ketplace." Id., 511–12. This court has long recognized that "[t]here is undoubtedly . . . an important policy [that] encourages employees to seek better jobs from other employers or to go into business for themselves . . . [as well as] a policy [that] is designed to protect employers against improper disclosures of information [that] their employees have received in confidence . . . . Our judicial decisions have faithfully sought to vindicate both policies by preserving to employees their unfettered right to leave their employment and [to] use elsewhere their acquired skill and knowledge of the trade generally as distinguished . . . from any trade secrets imparted to them in confidence and which they must continue to honor as such." (Internal quotation marks omitted.) *Allen Mfg. Co.* v. *Loika*, 145 Conn. 509, 517, 144 A.2d 306 (1958).[8]

"[T]he line distinguishing . . . an employee's general knowledge or skill and an employer's protectable trade secrets . . . may often be difficult to draw." *Mallet & Co.* v. *Lacayo*, 16 F.4th 364, 386 (3d Cir. 2021); see also *Van Products Co.* v. *General Welding & Fabricating Co.*, 419 Pa. 248, 263–64, 213 A.2d 769 (1965) ("[T]he concept of know-how is . . . a very fuzzily defined area, used primarily as a [shorthand] device for stating the conclusion that a process is [protectable]. It covers a multitude of matters, however, which in the broad sense are not [protectable], e.g., an employee's general knowledge and skill." (Internal quotation marks omitted.)). In the end, "[i]t is the trade secret owner that bears the burden of demonstrating its claimed secrets are protectable and are not general industry knowledge. Just how much specificity a court should

---

[8] Although *Allen Mfg. Co.* was decided before the enactment of CUTSA, numerous courts have concluded that the UTSA embodies the same principles. See, e.g., *PepsiCo, Inc.* v. *Redmond*, 54 F.3d 1262, 1268 (7th Cir. 1995) (trade secret law does "not prevent workers from pursuing their livelihoods when they leave their current positions").

Dur-A-Flex, Inc. *v.* Dy

require of the plaintiff-owner is . . . a context-specific matter.'' *Mallet & Co.* v. *Lacayo*, supra, 387; see also *Mattel, Inc.* v. *MGA Entertainment, Inc.*, 782 F. Supp. 2d 911, 967 (C.D. Cal. 2011) (plaintiff must ''describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit [the] defendant to ascertain at least the boundaries within which the secret lies'' (internal quotation marks omitted)).

Factors that courts have considered when determining whether a defendant wrongfully used a trade secret to develop a product or, instead, lawfully used his or her general knowledge and skill include whether the ingredients of the product were significantly different than those of the protected product; see, e.g., *Raytheon Co.* v. *Indigo Systems Corp.*, 895 F.3d 1333, 1341 (Fed. Cir. 2018); whether the protected product was created in or gave rise to ''a new and unique field'' of commercial endeavor; *Van Products Co.* v. *General Welding & Fabricating Co.*, supra, 419 Pa. 262; whether the defendant personally developed the protected product; see, e.g., id.; whether the information possessed and used by the defendant would be readily accessible to other similarly skilled persons in the same field; see, e.g., *System Development Services, Inc.* v. *Haarmann*, 389 Ill. App. 3d 561, 578, 907 N.E.2d 63, appeal denied, 233 Ill. 2d 600, 919 N.E.2d 366 (2009); and whether the process for making the protected product was used as a starting point for developing the new product. See, e.g., *Basic American, Inc.* v. *Shatila*, 133 Idaho 726, 741, 992 P.2d 175 (1999). These factors are not exclusive, and none is dispositive. See *MicroStrategy, Inc.* v. *Li*, 268 Va. 249, 265, 601 S.E.2d 580 (2004) (whether trade secret has been misappropriated ''is uniquely factual in nature

Dur-A-Flex, Inc. *v.* Dy

because it ordinarily involves extensive circumstantial evidence'').

We now turn to the question of whether the trial court correctly applied these principles to the facts when it concluded that Indue did not use the plaintiff's trade secrets to develop Indu-Crete. We conclude that it did. The uncontested evidence showed that Indu-Crete contained six ingredients that Poly-Crete did not contain, Poly-Crete contained ten ingredients that Indu-Crete did not contain, some ingredients that the products had in common were used for different purposes, Samet provided seven formulas to Indue that did not meet its special requirements before creating one that worked, Indu-Crete performed differently than Poly-Crete in the field, producers of the components of cementitious urethane products are ''legion'' and ''[e]verybody in the industry'' knows how to make the products, and Samet was largely responsible for the development of the Poly-Crete formula.[9] All of these facts support the court's conclusion that Samet primarily used his independent skills and knowledge to develop the Indu-Crete formula and that his knowledge of the specific Poly-Crete formula was not a substantial, contributing factor.

In support of its claim that Indue used its trade secrets, the plaintiff relies on the trial court's finding that Samet ''used [the plaintiff's] trade secrets to accelerate [the] development of . . . Indu-Crete,'' which can constitute misappropriation. See, e.g., *On-Line Technologies, Inc.* v. *Perkin-Elmer Corp.*, supra, 253 F. Supp. 2d 323; see also 4 R. Milgrim & E. Bensen, supra, § 15.01 [1] [d] [vi], p. 15-256. The plaintiff contends that this finding, combined with the court's finding that ProKrete

---

[9] We do not suggest that the fact that Samet developed the formula for Poly-Crete means that he could not have misappropriated the formula. That fact does indicate, however, that he had the skills and knowledge to develop other cementitious urethane flooring products.

embodied the Poly-Crete formula because Samet used his knowledge of the Poly-Crete formula to accelerate the development of ProKrete, compels the conclusion that Indu-Crete embodied the Poly-Crete formula.

We disagree that the conclusion urged by the plaintiff was the only reasonable outcome available to the trial court on the basis of its findings. The court acknowledged in its phase two memorandum of decision that the use of a trade secret can be established by showing that "a defendant was relying on the trade secret to assist or accelerate research or development." (Internal quotation marks omitted.) Later in its decision, the court stated that "speeding the creation of something by illegal means as [Samet] may have done with Indu-Crete is not the same as creating something that is itself illegal." Although this statement, taken out of context, could be suggestive of misappropriation, the court observed immediately thereafter that "Indu-Crete is not *substantially* the same formula created in *substantially* the same way . . . as Poly-Crete." (Emphasis added.) On the basis of this finding, the court concluded that, although "[s]ome [of the plaintiff's] DNA might be in Indu-Crete . . . from the totality of the circumstances, it is not enough of a match to call using Indu-Crete using [the plaintiff's] trade secrets."

The trial court thus distinguished the development of ProKrete, which it found embodied the plaintiff's trade secrets, from the development of Indu-Crete, which did not, on the ground that, unlike ProKrete, Indu-Crete did not *substantially* derive from the trade secrets. See Restatement (Third), supra, § 40, comment (c), p. 456 ("an actor is liable for using the trade secret with independently created improvements or modifications *if the result is substantially derived from the trade secret*" (emphasis added)). We conclude that the court's factual findings on this issue were sufficient to support this conclusion.

Dur-A-Flex, Inc. *v.* Dy

The plaintiff also contends that the trial court's finding that Samet used the plaintiff's trade secrets to accelerate the development of Indu-Crete is dispositive because "*any use*" of a trade secret as a starting point or to accelerate the development of a product constitutes use for purposes of CUTSA, regardless of whether the defendant used a substantial portion of the trade secret. (Emphasis in original.) In support of this proposition, the plaintiff cites numerous cases holding that a defendant's improvements to or modifications of a trade secret do not exempt the defendant from liability for using a trade secret to accelerate the development of a new product. None of the cases, however, holds that the substantial derivation standard is inapplicable to "starting point" or "acceleration" claims.[10] Indeed, if that standard does not apply in such cases, it is difficult to imagine in what type of case it would apply; the very word "derive" assumes that the trade secret was used as a starting point. See Webster's Third New International Dictionary (2002) p. 608 (defining "derive" as "to take or receive . . . from a source").[11]

[10] Other cases suggest that the substantial derivation standard does apply to "starting point" or "acceleration" claims. See, e.g., *Penalty Kick Management Ltd.* v. *Coca Cola Co.*, 318 F.3d 1284, 1293 (11th Cir. 2003) ("[A] defendant is liable for the misappropriation of a trade secret only if the plaintiff can show that the defendant . . . used a 'substantial portion' of the plaintiff's trade secret to create an improvement or modification that is 'substantially derived' from the plaintiff's trade secret. On the other hand, if the defendant independently created the allegedly misappropriated item with only 'slight' contribution from the plaintiff's trade secret, then the defendant is not liable for misappropriation.").

[11] We acknowledge that there is some tension between the trial court's conclusion that Samet's knowledge of the plaintiff's trade secrets did not substantially contribute to his development of the Indu-Crete formula and the court's conclusion that Samet was required to disgorge to the plaintiff $909,000 in payments that he received from Indue because he had used his knowledge of the trade secrets as a starting point for the development of that formula. If Samet did not use a *substantial portion* of the plaintiff's trade secrets to substantially accelerate his development of Indu-Crete, he should not be liable for use of the trade secrets. Samet has not participated in this appeal, and, therefore, we have no occasion to resolve this apparent anomaly.

Dur-A-Flex, Inc. *v.* Dy

Finally, the plaintiff contends that the trial court should not have applied the doctrine of independent development to conclude that Indue did not use the plaintiff's trade secrets because Indue never raised that doctrine as a special defense. See *Integrated Cash Management Services, Inc.* v. *Digital Transactions, Inc.*, 732 F. Supp. 370, 377–78 (S.D.N.Y. 1989) ("[when] a defendant in a trade secret case claims independent development, the burden shifts to the defendant to show that this was in fact the case"), aff'd, 920 F.2d 171 (2d Cir. 1990).[12] The plaintiff's claim is grounded on an incorrect premise. The court did not implicitly conclude that Indue independently developed a product that embodied the plaintiff's trade secrets, i.e., that Indue and the plaintiff followed separate and independent routes to the same destination. See *FMC Technologies, Inc.* v. *Murphy*, 679 S.W.3d 788, 806, 814 (Tex. App. 2023) (approving trial court's instruction to jury that " '[i]ndependent development' means that [the] defendant derived the trade secret information before the alleged act of misappropriation, or the defendant derived the trade secret information independent of the alleged act of misappropriation"). Rather, the court concluded that the Indu-Crete and Poly-Crete formulas were *substantially different destinations*. We conclude, therefore, that the court correctly determined that Indue did not use the plaintiff's trade secrets when it used Samet's formula to manufacture Indu-Crete.

2

We next address the plaintiff's claim that the trial court incorrectly determined that Krone, ECI, and Mer-

---

[12] But see *Moore* v. *Kulicke & Soffa Industries, Inc.*, 318 F.3d 561, 572 (3d Cir. 2003) ("independent development is intrinsic to whether the defendant 'used' the plaintiff's trade secret, supporting the conclusion that independent development is not an affirmative defense" (emphasis omitted)). Because we conclude that the plaintiff's claim is grounded on an incorrect premise, we need not determine whether independent development is an affirmative defense.

Dur-A-Flex, Inc. *v.* Dy

rifield neither knew nor should have known that they were using the plaintiff's trade secrets for purposes of § 35-51 (b) (2) (B) (iii). In response, Krone, ECI, and Merrifield contend that they did not use the plaintiff's trade secrets, and, even if they did, the court correctly determined that they did not do so knowingly. We agree with Krone, ECI, and Merrifield that the court's determination that they did not knowingly use the plaintiff's trade secrets was not clearly erroneous, and, therefore, we do not address their contention that they did not use the plaintiff's trade secrets.

The following additional facts are relevant to our resolution of this claim.[13] Evidence was presented at trial that ECI had been a longtime customer of the plaintiff and that Krone knew that the plaintiff had employed Samet. As we previously indicated, there also was evidence that Samet and A&E provided ECI with floor product samples within a few weeks of Samet's leaving the plaintiff, and ECI agreed to test the products in exchange for a discount on one of the products significantly below the price that it was then paying for similar products, including the plaintiff's products. All of the products provided by Samet and A&E that ECI evaluated had significant problems.

On November 24, 2014, before Krone or ECI were made defendants in this action, Krone wrote a letter to the Honorable Richard M. Rittenband, judge trial referee, who was then the presiding judge in this case. Krone stated in the letter, which was admitted into evidence at trial, that all of the components of cementitious urethane were "available in the public domain . . . and easily accessible for a creative formulator to use as a starting point formulation for a product like

_____

[13] We note that the plaintiff did not advance the majority of its argument in support of this claim until it filed its reply brief, and, therefore, Krone, ECI, and Merrifield did not have an opportunity to respond to it. Nevertheless, we consider the evidence because it does not affect our conclusion.

Dur-A-Flex, Inc. *v.* Dy

Poly-Crete.'' Krone also stated that the information about resinous floor coating systems contained in ''material safety, product data sheets, and expired patents . . . is readily ascertainable by any interested formulator'' and that ''[t]he number of resinous flooring purveyors commercially trading this class of materials presently demonstrates this.''

In June, 2015, Krone and ECI were added as defendants to this action. Krone testified at trial that, when he confronted Samet and Josh with the plaintiff's allegations, they stated that there was no truth to them and that he believed them.

The trial court concluded that this evidence did not establish that ''Krone had enough knowledge of the [plaintiff's] formulas and [Samet's] formulating process to mean that he [and, through him, ECI] should have known [that Samet] had embodied trade secrets in products he sold [to] him.'' The court expressly referred to Krone's letter to Judge Rittenband and noted that, although the letter ''seem[ed] to have gotten [Krone] sued,'' it did not establish that Krone knew that Samet had misappropriated the plaintiff's trade secrets. The court therefore rendered partial judgment for Krone and ECI.

With respect to Merrifield, the record shows that its representatives were subpoenaed to testify as nonparty witnesses in this case in February, 2015. According to two motions for capias and sanctions filed by the plaintiff, which the trial court ultimately denied, they refused to answer questions or to produce relevant documents. The plaintiff also claims that the evidence showed that Merrifield knew that Samet had been employed by the plaintiff.

Douglas Merrifield testified at trial that, at some point, he asked Samet about his knowledge of the plaintiff's formulas, and Samet's responses satisfied any con-

Dur-A-Flex, Inc. *v.* Dy

cerns that Douglas Merrifield had regarding misappropriation. He also testified that the products that Samet was providing were not performing properly in the field.

The trial court found that Douglas Merrifield saw the formulas that Samet was providing but that he was not in a position to compare the formulas to the formulas for the plaintiff's products. In addition, the court found that Douglas Merrifield's observation of the poor performance of Samet's products would support a reasonable belief that the formulas were not a mere "knockoff" of the Poly-Crete formula. Accordingly, the court rendered partial judgment for Merrifield.

Whether Krone, ECI, and Merrifield "knew or had reason to know" that their use of the plaintiff's trade secrets was wrongful for purposes of § 35-51 (b) (2) (B) (iii) is a mixed question of law and fact. The meaning of the relevant statutory language is a question of law subject to plenary review in accordance with General Statutes § 1-2z,[14] and the trial court's findings of the historical facts are subject to review for clear error. See, e.g., *Iacurci* v. *Sax*, supra, 313 Conn. 797 n.12.

We begin with the relevant statutory language. Section 35-51 (b) (2) defines "misappropriation" in relevant part as "use of a trade secret of another without express or implied consent by a person who . . . (B) at the time of . . . use, *knew or had reason to know* that his knowledge of the trade secret was . . . (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . . ." (Emphasis added.)

---

[14] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

Dur-A-Flex, Inc. *v.* Dy

As the trial court noted in its ruling denying ECI and Krone's motion for summary judgment on the plaintiff's misappropriation claims against them, "[o]ne has notice of facts . . . when he knows of them or when he should know of them . . . . He should know of them if, from the information [that] he has, a reasonable man would infer the facts in question, or if, under the circumstances, a reasonable [person] would be put on inquiry and an inquiry pursued with reasonable intelligence and diligence would disclose the facts. . . . Studious ignorance will not insulate a defendant from liability." (Citation omitted; internal quotation marks omitted.) Accord *Curtiss-Wright Corp.* v. *Edel-Brown Tool & Die Co.*, 381 Mass. 1, 6 and n.4, 407 N.E.2d 319 (1980); see also Restatement (Third), supra, § 40, comment (d), p. 457. Courts have noted that the defendant's knowledge "often must be proved by the weight of credible circumstantial evidence." *Curtiss-Wright Corp.* v. *Edel-Brown Tool & Die Co.*, supra, 6.

We conclude that the trial court's finding that Krone, ECI, and Merrifield did not know or have reason to know that Samet had misappropriated the plaintiff's trade secrets was not clearly erroneous. With respect to Krone and ECI, the evidence that they knew that Samet had been employed by the plaintiff, that Samet provided a formula within weeks of leaving the plaintiff, and that they were added as defendants in this action in 2015 does not compel the conclusion that they knew or should have known that Samet had misappropriated the plaintiff's formulas. See, e.g., *SASCO* v. *Rosendin Electric, Inc.*, 207 Cal. App. 4th 837, 848–49, 143 Cal. Rptr. 3d 828 (2012) ("It was perfectly legitimate for [the defendant company] to hire the individual defendants and for the individual defendants to leave the employ of [the plaintiff] in favor of a competitor, [the defendant company]. . . . Speculation that the individual employees must have taken trade secrets from [the

Dur-A-Flex, Inc. *v.* Dy

plaintiff] based on their decision to change employers does not constitute evidence of misappropriation.'' (Citation omitted.)). The court was free to credit the evidence showing that Krone was not in a position to compare the formula for Poly-Crete with the formula for ProKrete and Krone's testimony that he believed Samet's statement that he had not used the plaintiff's formulas, which testimony was bolstered by the evidence showing that the products that Samet provided to ECI all had significant problems. See, e.g., *Barlow* v. *Commissioner of Correction*, 343 Conn. 347, 368, 273 A.3d 680 (2022) ("It is the [fact finder's] exclusive province to weigh the conflicting evidence and to determine the credibility of witnesses. . . . The [fact finder] can . . . decide what—all, none or some—of a witness' testimony to accept or reject.'' (Internal quotation marks omitted.)).

The trial court was also free to draw an inference from Krone's letter to Judge Rittenband that Krone reasonably believed that Samet had used publicly available sources to develop the formula for ProKrete. To the extent that the plaintiff contends that being added as defendants in this action put them on notice, the plaintiff has cited no authority for the proposition that a defendant in an action pursuant to § 35-51 (b) (2) (B) (iii) is required to conduct an investigation of unproven allegations of misappropriation over the denials of another defendant accused of misappropriation. See *Silvaco Data Systems* v. *Intel Corp.*, 184 Cal. App. 4th 210, 230, 109 Cal. Rptr. 3d. 27 (Cal. App. 2010) (concluding that defendant did not have notice that trade secret had been misappropriated when it learned of plaintiff's unproven claims of misappropriation, which company accused of misappropriation denied) (overruled in part on other grounds by *Kwikset Corp.* v. *Superior Court*, 51 Cal. 4th 310, 246 P.3d 877, 120 Cal. Rptr. 3d 741

349 Conn. 513 SEPTEMBER, 2024 547

Dur-A-Flex, Inc. *v.* Dy

(2011)), review denied, California Supreme Court, Docket No. S183336 (August 18, 2010).

Similarly, with respect to Merrifield, the evidence that Douglas Merrifield was aware of this action and that he knew that Samet had been employed by the plaintiff and had developed Poly-Crete does not compel the conclusion that he knew or should have known that Samet had misappropriated the plaintiff's trade secrets. The trial court was free to credit the evidence that Douglas Merrifield was not in a position to know whether the ProKrete formula had been derived from the Poly-Crete formula, as well as Douglas Merrifield's testimony that Samet had denied using the plaintiff's formulas and that the first formulas that Samet provided for ProKrete performed poorly, which would not have been the case if they had been substantially derived from the Poly-Crete formula.

B

We next address the plaintiff's claim that the trial court improperly granted the defendants' motion for summary judgment on the civil conspiracy claims as to Krone, ECI, and Merrifield.[15] We disagree.

The following additional facts and procedural history are relevant to our resolution of this claim. Before trial, Krone and ECI filed a motion for summary judgment on the civil conspiracy claims against them, arguing that there was no genuine issue of material fact as to whether they had actual knowledge of the plaintiff's trade secrets. The trial court, *Sheridan, J.*, denied the motion, concluding that "[t]he law imposes no requirement that all the conspirators know every detail of every aspect of the formed conspiracy—it only requires that they be in agreement as to the purpose of the

---

[15] All references to the defendants in this subpart of the opinion are to Lipman, Durafloor, ProRez, Krone, ECI, and Merrifield.

Dur-A-Flex, Inc. *v.* Dy

conspiracy and the means by which it will be carried out.''

Thereafter, during phase two of the trial, the defendants filed a motion for summary judgment on the civil conspiracy claims, arguing that the claims were preempted by CUTSA pursuant to General Statutes § 35-57.[16] The plaintiff opposed the motion, arguing that ''a defendant may be liable for civil conspiracy to misappropriate trade secrets if he knew of the wrongful means and purposes of others in the conspiracy who may have violated CUTSA without having actually (1) acquired, (2) used, or (3) disclosed the trade secrets himself or herself.'' (Emphasis omitted.) The trial court, *Moukawsher, J.*,[17] agreed with the defendants that CUTSA preempted the civil conspiracy claims and granted the motion for summary judgment.

The plaintiff raises two claims. First, it claims that it was procedurally improper for the trial court to grant the motion for summary judgment on the civil conspiracy claims during trial. Second, it claims that the court incorrectly determined that its civil conspiracy claims against Krone, ECI, and Merrifield were preempted by CUTSA.

1

We first address the plaintiff's procedural claim. This court previously has recognized that ''the trial court, in the exercise of its case management authority, has the discretion, as a trial is about to begin, to decide a dispositive question of law that the parties to the case submit

---

[16] General Statutes § 35-57 provides in relevant part: ''(a) Unless otherwise agreed by the parties, the provisions of this chapter supersede any conflicting tort, restitutionary, or other law of this state pertaining to civil liability for misappropriation of a trade secret.

''(b) This chapter does not affect: (1) Contractual or other civil liability or relief that is not based upon misappropriation of a trade secret . . . .''

[17] All subsequent references to the trial court in this opinion are to Judge Moukawsher.

Dur-A-Flex, Inc. *v.* Dy

to the court orally, without a written motion or compliance with certain applicable provisions of the [rules of practice]. . . . A fortiori, the trial court . . . [has] such discretion to decide . . . dispositive questions of law that [have] been presented in writing . . . .'' (Emphasis omitted; footnote omitted; internal quotation marks omitted.) *McNamara* v. *Tournament Players Club of Connecticut, Inc.*, 270 Conn. 179, 193, 851 A.2d 1154 (2004). "We review case management decisions for abuse of discretion, giving [trial] courts wide latitude. . . . A party adversely affected by a [trial] court's case management decision thus bears a formidable burden in seeking reversal." (Internal quotation marks omitted.) *Krevis* v. *Bridgeport*, 262 Conn. 813, 818, 817 A.2d 628 (2003).

The plaintiff contends that, notwithstanding the broad discretion of the trial court to consider and decide a motion for summary judgment, regardless of when it is filed, it was improper under *Vertex, Inc.* v. *Waterbury*, 278 Conn. 557, 898 A.2d 178 (2006) (*Vertex*), for the trial court to consider the defendants' motion for summary judgment on the civil conspiracy claims when it was filed "long after the summary judgment deadline in this case [had] expired, and [when the plaintiff] was not in agreement that such a motion should be heard or considered." In *Vertex*, the trial court had, sua sponte, determined, on the basis of the parties' pretrial briefs, that two counts of the plaintiff's complaint were without legal merit. *Vertex, Inc.* v. *Waterbury*, supra, 564. On appeal, this court concluded that "[t]he trial court's broad case management authority simply does not extend so far as to permit the court to: (1) initiate the pretrial disposition of a claim based on the court's perception of its legal insufficiency; and (2) proceed to consider such disposition (a) in disregard of the procedural protections provided in our rules of practice without the agreement of counsel and (b) without notice to the

Dur-A-Flex, Inc. *v.* Dy

parties and a reasonable opportunity for the plaintiff to oppose the disposition of its claims.” Id., 569.

*Vertex* is not controlling in the present case. First, the trial court here did not initiate the pretrial disposition of a claim sua sponte but, rather, ruled on the defendants’ motion for summary judgment, the plaintiff had notice of the motion and filed an objection, and the court heard argument on the issue.

Second, although the plaintiff contends that the defendants violated the rules of practice by filing the motion “long after the summary judgment deadline . . . [had] expired,” it does not indicate how that purported deadline was set or when it expired. To the extent that the plaintiff—without saying so—believes that the defendants violated the provision of Practice Book § 17-44[18] requiring a party to seek permission from the trial court to file a motion for summary judgment after the case has been assigned for trial, we note that the defendants cited that rule in their motion for summary judgment and argued that, under *Krevis* and *McNamara*, the trial court had the authority to rule on their motion, even on the eve of trial. To conclude that this did not constitute a request for permission to file the motion pursuant to § 17-44 would elevate form over substance, and nothing in the rule bars the trial court from granting such permission without the agreement of the opposing party. Because the defendants filed a written motion for summary judgment and effectively complied with the provision in § 17-44 requiring them

[18] Practice Book § 17-44 provides in relevant part: “In any action . . . any party may move for a summary judgment as to any claim or defense as a matter of right at any time if no scheduling order exists and the case has not been assigned for trial. If a scheduling order has been entered by the court, either party may move for summary judgment as to any claim or defense as a matter of right by the time specified in the scheduling order. If no scheduling order exists but the case has been assigned for trial, a party must move for permission of the judicial authority to file a motion for summary judgment. . . .”

Dur-A-Flex, Inc. *v.* Dy

to seek the trial court's permission to file the motion, and because the plaintiff had an opportunity to respond to the motion, we conclude that the court did not abuse its discretion when it considered and granted the motion.

2

We next address the plaintiff's claim that the trial court improperly granted the defendants' motion for summary judgment. Specifically, the plaintiff claims that, if Krone, ECI, and Merrifield were not liable for misappropriating its trade secrets, its civil conspiracy claims against them could not have been preempted pursuant to § 35-57. The plaintiff contends that only claims alleging conduct that would actually constitute a violation of CUTSA are preempted by the statute. The plaintiff further contends that Krone, ECI, and Merrifield "should each be liable for civil conspiracy, *even assuming they have no knowledge (actual, constructive, or otherwise) of what* [*the plaintiff's*] *trade secrets were, or that the secrets were being used*, by simply having agreed to join and assist Samet, Josh, and Lipman in their illegal acts." (Emphasis added.) This, however, is not the claim that the plaintiff asserted in the trial court. At trial, the plaintiff claimed that, even if it was assumed that Krone, ECI, and Merrifield did not acquire, use, or disclose the plaintiff's trade secrets, they could be held liable for civil conspiracy *if they knew that Samet, Josh, and Lipman had misappropriated the trade secrets*, and if they aided and abetted that wrongful conduct for their own benefit. On appeal, the plaintiff claims that, *even if Krone, ECI, and Merrifield did not know or have reason to know that Samet had misappropriated the plaintiff's trade secrets*, they could be held liable for civil conspiracy if they in fact assisted the wrongful conduct of Samet, Josh, and Lipman in some manner. Thus, the plaintiff now appears to contend that civil conspiracy claims can be premised on something akin to strict liability. Because the plain-

Dur-A-Flex, Inc. *v.* Dy

tiff did not distinctly raise this claim in the trial court, it is unreviewable. See, e.g., *State* v. *Juan J.*, 344 Conn. 1, 12, 276 A.3d 935 (2022).

In its reply brief, the plaintiff retreats from this claim and again reasserts the claim that it made in the trial court, which is premised on the assumption that, even if Krone, ECI, and Merrifield did not misappropriate the plaintiff's trade secrets, they knew that Samet, Josh, and Lipman did. We ordinarily would not address a claim that was raised for the first time in a reply brief. See, e.g., *State* v. *Myers*, 178 Conn. App. 102, 106, 174 A.3d 197 (2017). Nevertheless, we conclude that this claim fails in light of our conclusion that the trial court reasonably found that Krone, ECI, and Merrifield did not know or have reason to know that Samet, Josh, and Lipman had misappropriated the plaintiff's trade secrets. See part I A 2 of this opinion.

C

We next address the plaintiff's claim that the trial court improperly denied the plaintiff's request that it maintain jurisdiction over Indue, Krone, ECI, and Merrifield for purposes of enjoining the future use of the plaintiff's trade secrets pursuant to General Statutes § 35-52 (a). We disagree.

The following additional facts are relevant to our resolution of this claim. In its motion for reconsideration of the trial court's rulings in its phase two memorandum of decision, the plaintiff contended that, because Indue, Krone, ECI, and Merrifield were now on notice that the products developed by Samet embodied the plaintiff's trade secrets, the court should permanently enjoin them from using those products in the future. The court concluded that it did not have "the power to enjoin people who have done nothing wrong." It further concluded that, although the plaintiff was correct that Indue, Krone, ECI, and Merrifield were on notice that

Dur-A-Flex, Inc. *v.* Dy

using ProKrete and ProSpartic would involve using the plaintiff's trade secrets, if they did so, "[the plaintiff] knows what to do, and [they] can have little doubt [the plaintiff] will do it."

"A prayer for injunctive relief is addressed to the sound discretion of the court and the court's ruling can be reviewed only for the purpose of determining whether the decision was based on an erroneous statement of law or an abuse of discretion." (Internal quotation marks omitted.) *Lydall, Inc.* v. *Ruschmeyer*, 282 Conn. 209, 236, 919 A.2d 421 (2007). The court may enjoin actual or threatened misappropriation of a trade secret. See General Statutes § 35-52 (a). As we already indicated, misappropriation occurs when, "at the time of . . . use, [a defendant] knew or had reason to know that his knowledge of the trade secret was . . . derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . . ." General Statutes § 35-51 (b) (2) (B) (iii).

The plaintiff contends that the trial court improperly denied its request for injunctive relief because, even if Indue, Krone, ECI, and Merrifield did not knowingly use the plaintiff's trade secrets in the past, they now know that Samet, Josh, and Lipman used the trade secrets to develop Indu-Crete, ProKrete, and other products and, therefore, that their future use of the trade secrets to manufacture those products would be unlawful. We conclude that, with respect to Indue, the factual premise of this claim is incorrect, as we held in this opinion that the trial court reasonably had determined that Samet did not use the plaintiff's trade secrets to develop Indu-Crete. With respect to Krone, ECI, and Merrifield, even if they unknowingly used products that embodied the plaintiff's trade secrets, the plaintiff has cited no evidence that they have any intention of continuing to do so. We conclude, therefore, that the trial court did not abuse its discretion when it concluded that

Dur-A-Flex, Inc. *v.* Dy

it should not grant the plaintiff's request for injunctive relief. See *BTS, USA, Inc.* v. *Executive Perspectives, LLC*, 166 Conn. App. 474, 498, 142 A.3d 342 (trial court did not abuse its discretion in denying request for injunctive relief pursuant to § 35-52 (a) when plaintiff "presented no evidence . . . of any wrongdoing by . . . the defendants in the past, *any intended wrongdoing in the future*, or any harm stemming from any alleged wrongdoing" (emphasis added)), cert. denied, 323 Conn. 919, 150 A.3d 1149 (2016).

D

We next address the plaintiff's claim that the trial court improperly sanctioned it for the attempted spoliation of evidence when no evidence was actually destroyed, and the defendants[19] did not act with due diligence by asking for the evidence through discovery before trial. The plaintiff further contends that, even if sanctions were properly imposed, the amount of the sanctions was grossly disproportionate to the misconduct.[20] We disagree.

The following additional facts are relevant to our resolution of this claim. During phase two of the trial, the plaintiff claimed that certain aspects of its manufacturing plant and equipment constituted trade secrets for purposes of CUTSA. During the testimony of the plaintiff's chief executive officer and owner, Robert Smith, the defendants' attorney began to question him about certain photograghs of the plant's interior that were posted on the plaintiff's Facebook page. The plaintiff's president, Ferris, was in the courtroom at the time and sent a text message to a marketing employee of

---

[19] All references to the defendants in this subpart of the opinion are to Samet, Josh, A&E, Lipman, Durafloor, ProRez, Krone, ECI, Merrifield, and Indue.

[20] The plaintiff has raised identical claims in its cross appeal. Our analysis applies equally to those claims.

Dur-A-Flex, Inc. *v.* Dy

the plaintiff directing him to remove all interior photographs of the plant from the plaintiff's Facebook page. Later, while Smith was testifying about a photograph of the plaintiff's founder standing next to machinery that the plaintiff claimed to be a trade secret, Ferris sent a text to the employee ordering him to remove the photograph " 'now.' " The photographs were removed, and Ferris sat silently as the defendants' attorneys attempted to find the photographs that they previously had seen on the plaintiff's Facebook page and asked Smith whether they had been removed.

During an evidentiary hearing the next day, Ferris admitted that he had ordered the removal of some photographs from the Facebook page, but he falsely denied having given the peremptory order to remove the photograph of the founder with the machinery. The defendants requested that the trial court sanction the plaintiff by dismissing the case, barring Ferris from testifying, or drawing an adverse inference. They also asked the court to award them attorney's fees and to impose a monetary sanction. The court concluded that the plaintiff should bear the costs incurred by the defendants as the result of Ferris' misconduct and imposed a monetary sanction of $25,000, noting that the court knew enough about the plaintiff to know that the sanction would "be noticed at the company but will not hamper its business." After receiving submissions from the parties, the court rejected the plaintiff's request that it award a maximum of $15,000 in attorney's fees and awarded $11,430 to Indue; $9810 to ProRez, Durafloor, ECI, and Krone; $3420 to Merrifield; and $4922 to A&E, Samet, and Josh, for a total of $29,582. The court acknowledged that the total amount of the fees was high but noted that there were ten defendants, that all of their attorneys were ethically bound to respond to and investigate Ferris' misconduct, and that none of the charges would have been incurred but for that misconduct.

Dur-A-Flex, Inc. *v.* Dy

This court has recognized that "a trial court in this state has the inherent authority to impose sanctions against an attorney and his client for a course of claimed dilatory, bad faith and harassing litigation conduct, even in the absence of a specific rule or order of the court that is claimed to have been violated." (Internal quotation marks omitted.) *CFM of Connecticut, Inc.* v. *Chowdhury*, 239 Conn. 375, 393, 685 A.2d 1108 (1996), overruled in part on other grounds by *State* v. *Salmon*, 250 Conn. 147, 735 A.2d 333 (1999). This includes "the inherent authority to assess attorney's fees when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons." (Internal quotation marks omitted.) Id., 394. "The decision to enter sanctions . . . and, if so, what sanction or sanctions to impose, is a matter within the sound discretion of the trial court. . . . In reviewing a claim that this discretion has been abused the unquestioned rule is that great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness." (Internal quotation marks omitted.) *D'Ascanio* v. *Toyota Industries Corp.*, 309 Conn. 663, 671, 72 A.3d 1019 (2013).

In the present case, we have little difficulty concluding that the trial court did not abuse its discretion when it imposed a monetary penalty and awarded attorney's fees to the defendants as sanctions for Ferris' misconduct. The misconduct resulted in significant confusion, aggravation, and inconvenience, and interrupted the trial for two days. In addition, it required the defendants to investigate whether the plaintiff had engaged in other misconduct and to brief what form of sanctions should be imposed. Most important, the misconduct was an affront to the integrity of the court. The fact that Ferris' misconduct was discovered and he was ultimately unsuccessful in his attempt to conceal that the photographs were posted on the plaintiff's Facebook page does not

Dur-A-Flex, Inc. *v.* Dy

reduce the egregious nature of the conduct; nor does the fact that the defendants did not seek information about the plaintiff's Facebook page through discovery before the issue arose at trial. We conclude that the amount of the monetary sanctions and attorney's fees was not grossly disproportionate to the harm suffered by the defendants and the trial court. We therefore reject this claim.

E

We next address the plaintiff's claim that the trial court improperly awarded attorney's fees to Krone and ECI pursuant to General Statutes § 35-54[21] on the ground that the plaintiff's claims of misappropriation against them were made in bad faith. The plaintiff contends that the court's finding of bad faith was barred by an earlier ruling by Judge Sheridan denying Krone and ECI's motion for summary judgment on the misappropriation claims on the ground that there was a genuine issue of material fact as to whether they should have known that the ProKrete formula had been acquired through improper means. The plaintiff further contends that the evidence produced at trial compels the conclusion that it did not assert its misappropriation claims against Krone and ECI in bad faith. We disagree.

The following additional facts are relevant to our resolution of this claim. In 2017, Krone and ECI moved for summary judgment on the claims against them, including the misappropriation claims. They argued that, "[r]egardless of whether a reasonable juror could find that [they] knew or should have known that [Samet] was misappropriating trade secrets, there is a separate and independent element of trade secret misappropriation requiring proof that the defendant actually knows the trade secret itself."

_____

[21] General Statutes § 35-54 provides in relevant part: "If a claim of misappropriation is made in bad faith . . . the court may award reasonable attorney's fees to the prevailing party."

Dur-A-Flex, Inc. *v.* Dy

They further argued that they did not know and had no reason to know the formula for any of the products that ECI evaluated for Samet.

Judge Sheridan denied the motion for summary judgment. Although Judge Sheridan agreed with Krone and ECI that there did not appear to be any genuine issue of material fact as to whether they knew the formulas for the products that Samet provided to ECI for evaluation, he concluded that the plaintiff was not required to prove such knowledge in order to prevail on its claim. Rather, he concluded that the plaintiff could prevail if it proved that they "had reason to know the information was acquired through improper means or was received in breach of another's duty of confidentiality to the trade secret owner . . . ." (Internal quotation marks omitted.) Judge Sheridan further concluded that there was a factual dispute as to that issue.

Thereafter, the trial court rendered judgment in favor of Krone, ECI, and Merrifield on the plaintiff's misappropriation claims. Those defendants then sought an award of attorney's fees and costs pursuant to § 35-54, arguing that the plaintiff acted in bad faith because it brought the action against them without any evidence that they knew or should have known that Samet had misappropriated the plaintiff's trade secrets. They further argued that the evidence that they knew that Samet had been employed by the plaintiff "simply [was] not enough" to support the plaintiff's misappropriation claims.

The trial court found that the plaintiff's claims against Krone and ECI "[stood] out among all of the claims as being meritless. Following the lengthy trial, the court was left with the impression . . . that the [action] against them was in retaliation for [Krone's] writing a letter to [Judge Rittenband] in defense of Samet . . . . Krone helped [Samet] in ways that never reflected that he knew he was using trade secret information." The court also

Dur-A-Flex, Inc. *v.* Dy

observed that there was undisputed testimony that Smith had acknowledged that the claims against Krone and ECI lacked merit. The court was apparently referring to Krone's testimony during phase two of the trial that he met with Smith in the fall of 2015, after Krone and ECI had been added as defendants, and that it was a ''very positive meeting, a good first step meeting, and that he would take what was discussed . . . back to [the plaintiff's attorney] and see . . . if he [could] get [them] released.'' ECI's president, Alan Landau, was also at the meeting and testified at trial that Smith had stated that he ''was going to go back and talk to [the plaintiff's attorney] . . . about having [them] released from this case because he didn't see the merit at that time.''[22]

The trial court also observed that the claims against Krone and ECI ''appear to be an example of a punitive attitude [that the plaintiff] took toward its competitors and those who would help Samet . . . . That attitude is a thread that has run through much of the evidence and testimony in the case.'' The court concluded that the ''claims were baseless'' and that ''they were made for the improper purpose of punishing and intimidating [Krone and ECI].'' The court therefore granted the request for an award of attorney's fees with respect to Krone and ECI. The court rejected the request with respect to Merrifield, finding that, although the plaintiff's claims against it were meritless, the court was not convinced that they were made in bad faith.

We first address the plaintiff's claim that ''it is . . . a bizarre, illogical, and legally improper result [when] the

---

[22] The plaintiff claims in passing and without explanation that Smith's statement ''should not have been admitted into evidence . . . .'' At trial, the plaintiff's attorney moved to strike Landau's testimony about the meeting for lack of a foundation and because it involved settlement discussions. The trial court denied the motion. The court also noted that Smith's statement was in the nature of an admission. See *Willow Funding Co.*, *L.P.* v. *Grencom Associates*, 246 Conn. 615, 620, 717 A.2d 1211 (1998) (admission of party opponent is exception to rule barring admission of hearsay evidence). The plaintiff does not expressly challenge this ruling on appeal.

Dur-A-Flex, Inc. *v.* Dy

trial court finds that issues of fact exist [that] need to be tried in denying summary judgment, and [when] it refused to dismiss those claims for lack of a prima facie case at trial, but later decides these claims were made in bad faith." Whether the denial of a defendant's motion for summary judgment precludes a later finding that there was no evidence to support an element of the plaintiff's claim as a matter of law is a question of law subject to plenary review. See, e.g., *Mirjavadi* v. *Vakilzadeh*, 310 Conn. 176, 183, 74 A.3d 1278 (2013).

The plaintiff cites no case law or other authority to support its claim that Judge Sheridan's denial of Krone and ECI's motion for summary judgment on the claims of misappropriation barred the trial court from making a later determination that the plaintiff brought the claims in bad faith because it knew that there was no evidence to support them, and our research has revealed no Connecticut cases addressing this issue. Multiple courts considering a closely related issue have held that a trial court's denial of a defendant's motion for summary judgment does not preclude a later finding by the court that the defendant is entitled to judgment as a matter of law. For example, in *Gross* v. *Southern Railway Co.*, 446 F.2d 1057 (5th Cir. 1971), the United States Court of Appeals for the Fifth Circuit, quoting its prior case law with approval, held that "[t]he existence of a genuine controversy [in connection with a motion for summary judgment] does not foreclose a directed verdict if on the evidence as it is actually and finally adduced on a trial reasonable minds could not reach a contrary conclusion." (Internal quotation marks omitted.) Id., 1060. The court stated that this holding "is a recognition that at times the issues may be such that only after the agony of a full-blown trial may it authoritatively be determined that there was never really the decisive issue of fact at all." (Internal quotation marks omitted.) Id. The court further observed that "[c]ertainty, or predictable certainty, if not actually

Dur-A-Flex, Inc. *v.* Dy

unobtainable, is often an illusion in the complex variables [that] pass through a courthouse door. The rules contemplate that a judge can take a first and a second and a third and a final look. It is the predictable uncertainty [that] sometimes makes this necessary." (Internal quotation marks omitted.) Id. Finally, the court noted that "[s]ound practical reasons . . . may justify a trial judge's denying a motion for summary judgment even on the identical evidence supporting his granting a directed verdict."[23] (Emphasis omitted; internal quotation marks omitted.) Id.

We find this reasoning persuasive. In addition, it is important to recognize that a trial court may not resolve credibility issues when ruling on a motion for summary judgment. See, e.g., *Doe* v. *West Hartford*, 328 Conn. 172, 197, 177 A.3d 1128 (2018). "It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given to their testimony can be appraised." (Internal quotation marks omitted.) Id. A court considering a motion for summary judgment also must view the evidence in the light most favorable to the nonmoving party; *Stearns & Wheeler, LLC* v. *Kowalsky Bros., Inc.*, 289 Conn. 1, 7, 955 A.2d 538 (2008); and the party seeking summary judgment is held to a strict standard. *Grenier* v. *Commissioner of Transportation*, 306 Conn. 523, 535, 51 A.3d 367 (2012). Thus, even when a trial court has serious doubts as to whether there is a genuine issue of material fact on an element of a claim, the court reasonably can deny the motion without prejudice to filing the motion again after the parties have had an opportunity to submit all of their evidence. We

---

[23] See also *Catts Co.* v. *Gulf Ins. Co.*, 723 F.2d 1494, 1502 (10th Cir. 1983) ("the denial of a motion for summary judgment does not rule out the possibility of . . . a directed verdict" (emphasis omitted)); *Chandler* v. *Buss*, 125 Ga. App. 882, 883, 189 S.E.2d 479 (1972) ("[i]t has frequently been stated that the denial of a motion for summary judgment may be proper even [when], under the same facts, a verdict should be directed on the trial of the case").

Dur-A-Flex, Inc. *v.* Dy

conclude, therefore, that Judge Sheridan's denial of Krone and ECI's motion for summary judgment on the ground that a reasonable fact finder might conclude that they knew or should have known that Samet had misappropriated the plaintiff's trade secrets did not preclude the trial court from reaching a contrary conclusion after hearing all of the evidence and assessing its credibility and persuasiveness.

We turn, therefore, to the issue of whether the trial court's conclusion that the plaintiff asserted the misappropriation claims against Krone and ECI in bad faith was clearly erroneous. See *Renaissance Management Co.* v. *Connecticut Housing Finance Authority*, 281 Conn. 227, 240, 915 A.2d 290 (2007) (whether party has acted in bad faith is issue of fact subject to review for clear error).

This court has not previously addressed the question of what constitutes bad faith for purposes of § 35-54. Other courts that have considered the question under analogous statutory provisions have concluded that the defendant must prove that the claim was "objectively specious" and that the plaintiff had "subjective bad faith." (Internal quotation marks omitted.) *SASCO* v. *Rosendin Electric, Inc.*, supra, 207 Cal. App. 4th 847; see also *Johnson Matthey Process Technologies, Inc.* v. *G.W. Aru, LLC*, 603 F. Supp. 3d 1374, 1379 (S.D. Ga. 2022) (under Georgia Trade Secrets Act, Ga. Code Ann. § 10-1-760 et seq., defendant must prove objective speciousness and subjective bad faith). "Objective speciousness exists [when] the action superficially appears to have merit but there is a complete lack of evidence to support the claim." (Internal quotation marks omitted.) *SASCO* v. *Rosendin Electric, Inc.*, supra, 845.

The court in *SASCO* also held that "[s]ubjective bad faith under [California's statutory analogue to § 35-54] means the action was commenced or continued for an

Dur-A-Flex, Inc. *v.* Dy

improper purpose, such as harassment, delay, or to thwart competition. . . . The absence of evidence alone, even after discovery, does not support a finding of subjective bad faith.'' (Citations omitted.) Id., 847. The court cited *Daniels* v. *Robbins*, 182 Cal. App. 4th 204, 225, 105 Cal. Rptr. 3d 683 (2010), in support of this proposition. Although the court in *Daniels* held that the fact that ''no competent evidence was adduced in discovery to support claims in an underlying action . . . does not, on its own, support a finding of malice''; id.; it also held that ''proof of malice can consist of evidence [when] a party *knowingly* brings an action without probable cause. . . . We think a corollary to this rule can be stated as follows: malice can be inferred when a party *continues* to prosecute an action after becoming aware that the action lacks probable cause.'' (Citation omitted; emphasis in original.) Id., 226; see also *Gabriel Technologies Corp.* v. *Qualcomm Inc.*, 560 Fed. Appx. 966, 969 (Fed. Cir. 2014) (under California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 et seq., ''the [D]istrict [C]ourt correctly determined that the . . . plaintiffs acted with subjective bad faith by stubbornly continuing to press their claims long after they realized that those claims were without evidentiary support''). Evidence that the plaintiff had an improper motive, such as causing unnecessary delay or harassing the defendant, may also support a finding of subjective bad faith. See *Johnson Matthey Process Technologies*, *Inc.* v. *G.W. Aru*, *LLC*, supra, 603 F. Supp. 3d 1382.

In the present case, the only evidence that the plaintiff points to in support of its claim that Krone and ECI knew or should have known that Samet had misappropriated the plaintiff's trade secrets is the evidence that Krone knew that Samet previously had worked for the plaintiff, that Samet provided products to ECI within a few weeks of his leaving the plaintiff, and that Krone was aware of the existence of this action and was ultimately added as

Dur-A-Flex, Inc. *v.* Dy

a defendant. As we already explained, "[s]peculation that [an employee] must have taken trade secrets from [its prior employer] based on [the] decision to change employers does not constitute evidence of misappropriation." *SASCO* v. *Rosendin Electric, Inc.*, supra, 207 Cal. App. 4th 848–49. Moreover, knowledge of unproven allegations of misappropriation that the defendant denies does not compel a finding of notice. See *Silvaco Data Systems* v. *Intel Corp.*, supra, 184 Cal. App. 4th 230. The plaintiff ignores the evidence—found credible by the trial court—that, unlike Poly-Crete, all of the products that Samet provided to ECI had significant problems, that Krone had no way of comparing the formulas developed by Samet with those developed by the plaintiff, that Samet denied having misappropriated the plaintiff's trade secrets when Krone confronted him with the plaintiff's allegations, that Smith indicated to Krone and Landau in the fall of 2015 that he saw no merit to the plaintiff's claims against them, and that, in his November 24, 2014 letter to Judge Rittenband, Krone expressed his belief that Samet had developed the formulas from information in the public domain.

On the basis of this evidence, we conclude that the trial court's finding that the claims against Krone and ECI were objectively specious was not clearly erroneous. In addition, although it would have been helpful if the court had identified the specific evidence supporting its conclusion that the plaintiff had displayed a "punitive attitude" toward Krone and ECI, and was retaliating against them for their support of Samet, we cannot conclude that the court's finding that the plaintiff knew fairly early in the litigation, if not from the start, that its claims against Krone and ECI were without evidentiary support and were therefore pursued with subjective bad faith was clearly erroneous. See *Daniels* v. *Robbins*, supra, 182 Cal. App. 4th 226 ("malice can be inferred when a party *continues* to prosecute an

Dur-A-Flex, Inc. *v.* Dy

action after becoming aware that the action lacks probable cause'' (emphasis in original)).

In reaching this conclusion, we recognize that there may be some merit to the plaintiff's contention that a finding of bad faith is unwarranted when a party does not recognize until trial has ended that a claim lacks any credible evidentiary support. This is not the case here. Notwithstanding the plaintiff's insistence that Krone and ECI had to have engaged in a systematic program of '' 'studious ignorance' '' to be unaware of Samet's unlawful activities, there was never any persuasive evidence that they should have known that Samet had misappropriated the plaintiff's trade secrets. There is evidence, however, that would support a finding that the plaintiff knew early on in the litigation that its claims against them were specious. Because § 35-54 requires nothing more than a finding of bad faith, we conclude that the trial court did not abuse its discretion in awarding attorney's fees to Krone and ECI.

II

LIPMAN, DURAFLOOR, AND PROREZ'
CLAIMS ON APPEAL

A

We next address the claim of the defendants Lipman, Durafloor, and ProRez[24] that the trial court misconstrued the knowledge requirement of § 35-51 (b) (2) (B) (iii).[25] In the court's view, the plaintiff was required to

_____

[24] All references to the defendants in part II of this opinion are to Lipman, Durafloor, and ProRez.

[25] The defendants contend that the trial court applied clause (ii) of § 35-51 (b) (2) (B), not clause (iii), and characterize the plaintiff's position as being that ''knowledge is not a requirement because [the plaintiff] could have prevailed under [clause] (iii) of [§ 35-51 (b) (2) (B)].'' (Internal quotation marks omitted.) They further contend that we should decline to review this purported claim because the plaintiff did not file a statement of alternative grounds to affirm under Practice Book § 63-4 (a) (1). For the reasons explained in footnote 6 of this opinion, we disagree that the trial court applied § 35-51 (b) (2) (B) (ii) to the claims against any of the defendants

Dur-A-Flex, Inc. *v.* Dy

prove only that the defendants knew or should have known that Samet misappropriated the plaintiff's trade secrets. Thus, the court concluded that, if the defendants knew or should have known that Samet used his knowledge of trade secrets to develop a product, their *use* of the product would constitute "knowledge of the trade secret" for purposes of § 35-51 (b) (2) (B) (iii). The defendants claim that the knowledge that Samet misappropriated the plaintiff's trade secrets would not satisfy the requirement that they had "knowledge of the trade secret." Instead, they claim, the plaintiff was required to prove that Lipman himself and, through him, Durafloor and ProRez, had knowledge of the plaintiff's trade secrets. We agree with the defendants that the court's interpretation was incorrect and that the plaintiff was required to prove that Lipman had knowledge of the trade secrets.[26]

As a preliminary matter, we note that the trial court's phase two memorandum of decision is not entirely clear as to whether the court concluded that the defendants knew that Samet was using his knowledge of the plaintiff's trade secrets to develop the products that he provided to them or, instead, that the defendants themselves had knowledge of the trade secrets. The court found that Lipman "was an expert installer and led the field tests that led to ProKrete with full knowledge that what was mixing and what was going down was almost the mirror of what [the plaintiff had] developed and owned," but it never expressly found that

_____

except Samet. In any event, we do not understand the plaintiff to be claiming that it can prevail under clause (iii), even if it cannot prevail under clause (ii); both clauses have the same knowledge requirement.

[26] As we discuss more fully subsequently in this opinion, a defendant's knowledge of a trade secret may be actual or constructive for purposes of § 35-51 (b) (2) (B) (iii). We conclude, however, that the mere use of a product that another person had developed by using a trade secret does not constitute constructive knowledge of the trade secret, even if the user knew or should have known of the misappropriation.

Dur-A-Flex, Inc. *v.* Dy

Lipman had knowledge of either the plaintiff's trade secrets or the formulas that Samet developed that embodied the trade secrets.[27] We conclude that, in light of Judge Sheridan's ruling that the plaintiff was not required to prove that the defendants had knowledge of the plaintiff's trade secrets, but only that they knew that Samet was using his knowledge of the trade secrets to develop his products, the most reasonable interpretation of the court's ruling is that it found that Lipman knew, on the basis of the similarity between the plaintiff's and Samet's products, that Samet was using his knowledge of the plaintiff's trade secrets to develop the products, and Lipman then used the products. The court did not find that Lipman had knowledge of the plaintiff's trade secrets, either through working for the plaintiff or through seeing Samet's formulas for Pro-Krete and ProSpartic, which embodied the trade secrets, and then used that knowledge to develop or manufacture the products.

Whether § 35-51 (b) (2) (B) (iii) requires a plaintiff to prove that a defendant had knowledge of the trade secret and what that requirement means are questions of statutory interpretation subject to plenary review governed by well established principles under § 1-2z. See, e.g., *Adesokan* v. *Bloomfield*, 347 Conn. 416, 425, 297 A.3d 983 (2023).

In accordance with § 1-2z, we begin with the language of the statute. Section 35-51 (b) (2) defines "misappropriation" in relevant part as "use of a trade secret of another without express or implied consent by a person who . . . (B) at the time of . . . use, knew or had reason to know that *his knowledge of the trade secret* was . . . (iii) derived from or through a person who

_____

[27] The trial court noted that Lipman had testified that "it was [Samet] who was doing the formulating." Again, however, the court did not expressly indicate whether Samet gave his formulas, which embodied the plaintiff's trade secrets, to Lipman.

Dur-A-Flex, Inc. *v.* Dy

owed a duty to the person seeking relief to maintain its secrecy or limit its use . . . .'' (Emphasis added.)

We agree with the defendants that, on its face, § 35-51 (b) (2) (B) (iii) appears to *assume* that the person who used the trade secret of another would have knowledge of the trade secret itself, not merely knowledge that the product that the person was using was developed by someone who was using a trade secret. It is not entirely clear to us, however, that the framers of the UTSA *intended* that such knowledge would be a required element of misappropriation, especially in light of the split of authority on the issue.

In support of their claim that the framers of the UTSA had this intention, the defendants cite *Silvaco Data Systems* v. *Intel Corp.*, supra, 184 Cal. App. 4th 210, in which the California Court of Appeal applied a definition of "misappropriation" that is substantially identical to that set forth in § 35-51. See id., 222 n.6; see also Cal. Civ. Code § 3426.1 (b) (Deering 2005). In that case, the plaintiff, Silvaco Data Systems (Silvaco) claimed that the defendant, Intel Corporation (Intel) had used computer software acquired from another company, Circuit Semantics, Inc. (CSI), with knowledge that Silvaco had accused CSI of using its trade secrets, namely, a certain source code,[28] to create the software. *Silvaco Data Systems* v. *Intel Corp.*, supra, 215–16. Intel moved for summary judgment, claiming that it had never possessed the source code but possessed only the executable program; id., 217; which was not "readily intelligible to human beings . . . ."[29] Id., 218. Intel argued that, because

---

[28] "[S]ource code describes the text in which computer programs are originally written by their human authors using a high-level programming language." (Internal quotation marks omitted.) *Silvaco Data Systems* v. *Intel Corp.*, supra, 184 Cal. App. 4th 217.

[29] According to the court in *Silvaco Data Systems*, source code must be translated into machine readable code in order for a computer application to function. *Silvaco Data Systems* v. *Intel Corp.*, supra, 184 Cal. App. 4th 218. The executable code consists of "strings of binary (base 2) or hexadecimal (base 16) numbers" that are "not readily intelligible to human beings . . . ." Id.

Dur-A-Flex, Inc. *v.* Dy

it never possessed the source code, it never had "knowledge of the trade secret" as required by § 3426.1 (b) of the California Uniform Trade Secrets Act. (Internal quotation marks omitted.) Id., 217; see Cal. Civ. Code § 3426.1 (b) (Deering 2005).

The court concluded that "[t]he sine qua non of a trade secret . . . is the plaintiff's possession of information of a type that can, at the possessor's option, be made known to others, or withheld from them, i.e., kept secret." *Silvaco Data Systems* v. *Intel Corp.*, supra, 184 Cal. App. 4th 220. Therefore, the court concluded, the characteristics of Silvaco's computer program that became apparent by executing the program were not trade secrets because they were known to anyone executing the program. Id., 221–22. The only trade secrets were to be found in Silvaco's source code, which Intel never had in its possession and, therefore, could not have disclosed. Id., 222–23.

The court further concluded that a person does not use a trade secret when one uses "*something that was made* using the [trade] secret." (Emphasis in original.) Id., 224. Resorting to a colorful analogy, the court stated: "One who bakes a pie from a recipe certainly engages in the use of the latter; but one who eats the pie does not, by virtue of that act alone, make use of the recipe in any ordinary sense, and this is true even if the baker is accused of stealing the recipe from a competitor, and the diner knows of that accusation." (Internal quotation marks omitted.) Id. In other words, *using* a trade secret necessarily entails having *knowledge* of the trade secret; one cannot happen without the other.

Finally, the court concluded that Silvaco could not establish that Intel had the requisite "knowledge of the trade secret" under the California Uniform Trade Secrets Act. (Internal quotation marks omitted.) Id., 225, 229; see Cal. Civ. Code § 3426.1 (b) (Deering 2005).

Dur-A-Flex, Inc. *v.* Dy

The court reasoned: "To know a thing is to have information of that thing at one's command, in one's possession, subject to study, disclosure and exploitation. To say that one knows a fact is also to say that one *possesses information* of that fact. Thus, although the Restatement [(Third)] of Unfair Competition does not identify knowledge of the trade secret as an element of a trade secrets cause of action, the accompanying comments make it clear that liability presupposes the defendant's possession of misappropriated information. [See Restatement (Third), supra, § 40, comment (d), p. 457] (To subject an actor to liability . . . the owner need not prove that the actor knew that *its possession of the trade secret* was wrongful; it is sufficient if the actor had reason to know. Thus, if a reasonable person in the position of the actor would have inferred that *he or she was in wrongful possession* of another's trade secret, the actor is subject to liability for any subsequent use or disclosure. A number of cases also subject an actor to liability if, based on the known facts, a reasonable person would have inquired further and learned that *possession of the information* was wrongful. . . .); see id., [reporters' note to comment (d)], p. 465 ([w]hen the defendant knows that *its possession of the secret* is improper, it is subject to liability for any subsequent use or disclosure . . .); id., p. 466 (citing holdings that a defendant is not liable for use or disclosure unless it knows or has reason to know that the *information in its possession* is a secret); [id.] (rule [when] the defendant learns that it has unauthorized *possession of another's trade secret* only after a period of innocent exploitation . . .)." (Emphasis in original; footnote omitted; internal quotation marks omitted.)[30] *Silvaco Data Systems* v. *Intel Corp.*, supra,

[30] Section 40 of the Restatement (Third) of Unfair Competition provides in relevant part: "One is subject to liability for the appropriation of another's trade secret if:

\* \* \*

"(b) the actor uses or discloses the other's trade secret without the other's consent and, at the time of the use or disclosure,

Dur-A-Flex, Inc. *v.* Dy

184 Cal. App. 4th 226. The court concluded that, because there was "no evidence that Intel ever possessed or had knowledge of any source code connected with [the computer software it acquired from CSI]," it did not have the requisite knowledge to be held liable for misappropriation. Id.

The court ultimately concluded that "[l]iability under [the California Uniform Trade Secrets Act] is not dependent on the defendant's comprehension of the trade secret but does require knowledge of it." (Internal quotation marks omitted.) Id., 229. Because Intel did not know and had no way to get the information constituting Silvaco's trade secrets, it could not be held liable for misappropriation. Id.; see also *Control Module, Inc.* v. *Data Management, Inc.*, Docket No. 3:07CV00475 (AWT), 2007 WL 4333814, *4 (D. Conn. December 10, 2007) ("[o]ne cannot be liable pursuant to § 35-51 (b) (2) unless, having knowledge of the trade secret, one discloses or uses that trade secret, which means . . . that [the defendant] must itself have knowledge of and used or disclosed the [t]rade [s]ecrets").

The court emphasized that nothing in its decision "should be taken to suggest that a defendant cannot be liable for misappropriation unless he *personally* possessed knowledge of the trade secret. He can of course

"(1) the actor knows or has reason to know that the information is a trade secret that the actor acquired under circumstances creating a duty of confidence owed by the actor to the other . . . or

"(2) the actor knows or has reason to know that the information is a trade secret that the actor acquired by means that are improper . . . or

"(3) the actor knows or has reason to know that the information is a trade secret that the actor acquired from or through a person who acquired it by means that are improper . . . or whose disclosure of the trade secret constituted a breach of a duty of confidence owed to the other . . . ." Restatement (Third), supra, § 40, pp. 452–53.

Thus, the Restatement (Third) presumes that a trade secret is comprised of "information" and that the person accused of misappropriation must "acquire," i.e., take possession of, that information to be liable.

Dur-A-Flex, Inc. *v.* Dy

acquire such knowledge, and indeed can conduct the entire misappropriation, *vicariously*, e.g., through an agent.[31] Further, *constructive* knowledge of the secret may well be sufficient, at least in some circumstances.[32] Thus one who knowingly possesses information constituting a trade secret cannot escape liability merely because he lacks the technical expertise to understand it, or does not speak the language in which it was written." (Emphasis in original; footnotes added.) *Silvaco Data Systems* v. *Intel Corp.*, supra, 184 Cal. App. 4th 225 n.7. But see *Control Module, Inc.* v. *Data Management, Inc.*, supra, 2007 WL 4333814, *4 ("CUTSA does not include within its definition of 'misappropriation' inducing, encouraging, aiding, or abetting another to misappropriate a trade secret").

We agree with the court in *Silvaco Data Systems* that, although there is authority to support the notion that knowledge of the trade secret is not required, that authority is unpersuasive. *Silvaco Data Systems* v. *Intel Corp.*, supra, 184 Cal. App. 4th 226–29; see also *ClearOne Communications, Inc.* v. *Chiang*, Docket No. 2:07-cv-37 TC, 2007 WL 4376125, *2 n.3 (D. Utah December 13, 2007) ("Although [Utah's Uniform Trade Secret Act, Utah Code Ann. § 13-24-1 et seq.] uses the phrase 'knowledge of the trade secret,' there is no authority

---

[31] See, e.g., *E. Udolf, Inc.* v. *Aetna Casualty & Surety Co.*, 214 Conn. 741, 746, 573 A.2d 1211 (1990) ("knowledge of . . . an agent while acting within the scope of his authority and in reference to a matter over which his authority extends . . . is . . . knowledge of . . . the principal" (internal quotation marks omitted)).

[32] The court in *Silvaco Data Systems* did not explain what circumstances might justify a finding of constructive knowledge. Perhaps, if a file room clerk stole a sealed file containing trade secrets from his employer and sold it to a competitor, the clerk would have constructive knowledge of the trade secrets, even if he never saw them because he had possession of and was able to share them. See *Silvaco Data Systems* v. *Intel Corp.*, supra, 184 Cal. App. 4th 220 ("[t]he sine qua non of a trade secret . . . is the . . . possession of information of a type that can, at the possessor's option, be made known to others").

Dur-A-Flex, Inc. *v.* Dy

that this phrase creates an element of comprehension. Rather, this phrase is generally understood to reflect knowledge that the trade secret was derived through improper means.''); *Data General Corp.* v. *Grumman Systems Support Corp.*, 825 F. Supp. 340, 359 (D. Mass. 1993) (''[a]n infringer may be liable for misappropriating trade secrets when it loads and runs a computer program in its object code form, even if the infringer never understands exactly how the program works''), rev'd in part on other grounds, 36 F.3d 1147 (1st Cir. 1994).

The court in *Silvaco Data Systems* concluded that the court in *ClearOne Communications, Inc.*, had ''dismissed'' the actual text of the applicable statute and had ''conflat[ed] two distinct mental elements of liability . . . .'' *Silvaco Data Systems* v. *Intel Corp.*, supra, 184 Cal. App. 4th 227. The court further noted that a treatise that the court in *ClearOne Communications, Inc.*, had cited had been superseded, and, in any event, it did not support the proposition that ''[l]iability . . . attaches only in the event that it can be proved that the defendant used or disclosed the trade secret after having actual knowledge or reason to know that the information was improperly obtained.''[33] (Internal quotation marks omitted.) Id., quoting *ClearOne Communications, Inc.* v. *Chiang*, supra, 2007 WL 4376125, *2 n.3. Rather, the quoted language ''appears in the context of the author's enumeration of the *different types of*

---

[33] The most recent edition of this treatise provides that, ''if the new employer or other third party learns that the information was improperly obtained before the information was used, the employer or third party becomes equally liable for trade secret misappropriation upon any subsequent use.'' 1 M. Jager & B. Lane, Trade Secrets Law (2023) § 5:8. Like the language cited by the court in *ClearOne Communications, Inc.*, this language does not indicate that knowledge that the information was improperly obtained is the *only* knowledge requirement or that the plaintiff is not *also* required to prove knowledge of the trade secret itself. Section 5:8 of the treatise discusses *Silvaco Data Systems* at length, including the court's conclusion that, to prove misappropriation, a plaintiff must prove that the defendant had knowledge of the trade secret. See id.

*misappropriation* that may be predicated on use or disclosure. The . . . language does not concern the defendant's knowledge *of the trade secret* but his cognizance of the means by which it was obtained. The statute specifies required mental states with respect to both the trade secret *and* the means by which it became available to the defendant. To equate one of these requirements with the other offends basic principles of statutory construction.'' (Emphasis in original; footnote omitted; internal quotation marks omitted.) *Silvaco Data Systems* v. *Intel Corp.*, supra, 227–28. In other words, the court in *Silvaco Data Systems* concluded that Silvaco was required to prove *both* that Intel knew that CSI had misappropriated Silvaco's trade secrets *and* that Intel had knowledge of the trade secrets.

With respect to *Data General Corp.*, the court in *Silvaco Data Systems* concluded that the court's ''reasoning reflects a certain vagueness, not to say incoherence, about what constituted the trade secret at issue there.'' Id., 228. Specifically, the court in *Data General Corp.* had not explained how the use of object code could result in misappropriation when object code, unlike source code, does not constitute information, ''any more than a pie is the same information as the recipe used to bake it.'' (Internal quotation marks omitted.) Id., 228–29.

We are persuaded by the analysis of the court in *Silvaco Data Systems* and conclude that the defendant's knowledge of the trade secret is an element of a claim of misappropriation under § 35-51 (b) (2) (B) (iii) and that a defendant cannot ''use'' a trade secret for purposes of that statute if the defendant does not have knowledge of the trade secret itself. That is, the defendant must actually or constructively possess the information that constitutes the trade secret, and not merely use or possess a product that embodies the trade secret

but does not disclose to the defendant any material aspect of the trade secret itself. We conclude, therefore, that the trial court's interpretation of the statute was incorrect. Accordingly, we reverse the judgment against the defendants on the misappropriation claims and remand the case for a new trial limited to this issue.[34] See, e.g., *South Windsor* v. *Lanata*, 341 Conn. 31, 42, 266 A.3d 875 (2021) ("a retrial may be limited to a specific issue or issues, [when] the error as to one issue or issues is separable from the general issues . . . [and] such . . . limitation does not work injustice to the other issues or the case as a whole" (internal quotation marks omitted)). If the trial court concludes on remand that the defendants did not have knowledge of the plaintiff's trade secrets, it necessarily must find that the defendants did not use the trade secrets. On the other hand, if the court determines that Lipman had knowledge of the trade secrets, it must then determine whether he used that knowledge to develop or manufacture ProKrete or ProSpartic.

B

We next address the defendants' claim that the trial court failed to properly balance the interest of the defendants in pursuing their livelihoods in the area of their greatest expertise with the plaintiff's interest in protecting itself from unfair competition when it determined that they had misappropriated the plaintiff's trade secrets to develop ProKrete and ProSpartic.[35] We are not persuaded.

---

[34] The plaintiff contends that, even if it was required to establish that the defendants had knowledge of its trade secrets, the evidence presented at trial showed that Lipman and, through him, Durafloor and ProRez, had knowledge of the Poly-Crete formula. This court cannot find facts on appeal. See, e.g., *State* v. *Edwards*, 314 Conn. 465, 478, 102 A.3d 52 (2014).

[35] We note that the trial court's conclusion that the defendants used the plaintiff's trade secrets appears to have been premised solely on its conclusion that they used products that they knew or should have known Samet had developed using the trade secrets. That conclusion was incorrect, as a defendant cannot use a trade secret without having knowledge of it. See part II A of this opinion. Nevertheless, the issue of whether the court correctly determined that *Samet* had knowledge of and used the plaintiff's trade

Dur-A-Flex, Inc. *v.* Dy

The trial court found the following additional relevant facts. While still working for the plaintiff, Samet set up a chemistry lab in his garage for his nephew, Josh, who was a "C" chemical engineering student at the University of Connecticut for approximately nine years. Josh testified at trial that Samet had demanded that he work out chemistry problems on his own and that he started his work by looking at ingredients in patents and product brochures. The trial court found, however, that none of those ingredients was included in Josh's formulas for ProKrete. Instead, Samet selected the chemicals to be incorporated into the products and provided them to Josh. Out of the thousands of chemicals that were available for manufacturing cementitious urethane, Samet selected those used in the Poly-Crete formula, including the hardener, and those that were made by the plaintiff's suppliers. The court also found that Samet would frequently adjust the formulas created by Josh.

Josh began his work on developing cementitious urethane on September 6, 2013, and had a formula by September 30, 2013. The final ProKrete formula was completed by December, 2014. Josh admitted at trial that matching or exceeding the Poly-Crete formula had always been the goal. An expert witness for the plaintiff testified that he had forty-one years of experience in the cementitious urethane flooring business and that it would have taken him three to five years to develop such a formula.

The trial court found that the chemicals used in the process of formulating ProKrete that were also contained in Poly-Crete included two polyols, the surfac-

secrets is likely to arise on remand if the trial court determines that Samet was acting as Lipman's agent when he misappropriated the plaintiff's trade secrets. Accordingly, we address that issue.

Dur-A-Flex, Inc. *v.* Dy

tant, the principal defoamer, the filler, and the hardener. The defoamer had been developed especially for the plaintiff and was not advertised by the manufacturer but had to be requested by name. In addition, in the process of developing ProKrete, Samet used several specific products that he also had used in researching the development of Poly-Crete. After conducting a comparative demonstration, the court found that there were substantial similarities in the performance of ProKrete and Poly-Crete during installation and that, once they dried, they were identical.

The trial court further found that, while discovery requests for the information were pending, Samet destroyed or erased numerous files and other information on his computers. The court concluded that Samet's testimony in court and at his deposition denying that he had done so was perjured. Pursuant to Practice Book § 13-14, the court drew an adverse inference from this conduct and concluded that the information that was destroyed would have shown that Samet stole trade secrets belonging to the plaintiff. Other evidence produced at trial established that Samet had, on one of his USB drives, "a Poly-Crete mixing video with all the ingredients explained."

With respect to Samet's ProSpartic formula, the trial court found that Samet "developed a polyaspartic product part of the way" while employed by the plaintiff, but the product was "put on the shelf . . . ." The court further found that "[Josh's] starting point for [ProSpartic's] . . . development simply adopted the patent circumventing idea [Samet] first discovered" while he was working for the plaintiff.

On the basis of these subsidiary factual findings, the trial court concluded that Samet had used the plaintiff's trade secrets to develop the ProKrete and ProSpartic formulas in violation of CUTSA and rejected the defen-

Dur-A-Flex, Inc. *v.* Dy

dants' claim that Josh had used information that was in the public domain to develop the products. The court also rejected the defendants' contention that Samet had done nothing more than use his general knowledge as a chemist to develop ProKrete, which he would have been entitled to do. The court observed that an employee lawfully "can take and use knowledge of some things" when he or she leaves a job, and "[t]here certainly are things that it would be entirely unreasonable to ask chemists to unlearn . . . ." The court concluded that, although it "might be okay" to include the names of commonly known chemicals, basic research practices, and "good lab bookkeeping" in the "tool kit" that a chemist lawfully can take with him, a chemist would not be entitled to take "a USB device containing a secret formula." The court further concluded that the defendants knew or should have known that Samet had used the plaintiff's trade secrets to develop the ProKrete and ProSpartic formulas.

As we discussed in part I A 1 of this opinion, this court has long recognized the competing interests of employees in being able to leave employers and to continue to work in the area of their greatest expertise and of employers in protecting their trade secrets. See, e.g., *Allen Mfg. Co.* v. *Loika*, supra, 145 Conn. 517. As we also explained, the question of whether a former employee was lawfully continuing to use his general knowledge and expertise or, instead, was unlawfully using his former employer's protectible "know-how" involves a very "fuzzily defined" concept. (Internal quotation marks omitted.) *Van Products Co.* v. *General Welding & Fabricating Co.*, supra, 419 Pa. 263. "The question of whether information sought to be protected by [CUTSA] rises to the level of a trade secret is one of fact for the [fact finder in the] trial court." (Internal quotation marks omitted.) *Elm City Cheese Co.* v. *Federico*, 251 Conn. 59, 68, 752 A.2d 1037 (1999).

Dur-A-Flex, Inc. *v.* Dy

In the present case, the defendants claim that the trial court's statement that it "might be okay" for Samet to use his knowledge of basic chemistry and scientific principles after he left the plaintiff's employment shows that the court's "starting position was that it was unclear" whether Samet had the right to continue in his chosen profession, and, therefore, the court could not have properly balanced the relevant competing interests.[36] Given the highly fact-specific nature of the determination as to whether an employee accused of misappropriation was using his general knowledge and expertise or, instead, was using his former employer's trade secrets, we cannot conclude that the trial court in the present case improperly balanced the competing interests at issue. The court's use of the casual phrase it "might be okay" notwithstanding, the court clearly recognized that Samet had the right to continue to use his general knowledge and expertise as a chemist after he left the plaintiff's employment. We conclude that the court's finding that Samet had not used his general knowledge but, instead, had misappropriated the plaintiff's trade secrets and used them to develop the formulas for ProKrete and ProSpartic was amply supported by the evidence. We therefore reject this claim.

C

We next address the defendants' claim that the plaintiff failed to identify its trade secrets with sufficient particularity or specificity in its complaint and in its responses to Knone and ECI's interrogatories. The

---

[36] In the portion of their reply brief addressing this claim, the defendants raise the additional claim that the plaintiff failed to identify its trade secrets *to its employees* with sufficient particularity to allow them to carry on their professions after they left the plaintiff's employment. This claim is distinct from the defendants' claim that the plaintiff failed to identify its trade secrets with sufficient particularity for purposes of this litigation. See part II C of this opinion. We are not required to address claims that are raised for the first time in a reply brief. See, e.g., *State* v. *Myers*, supra, 178 Conn. App. 106.

Dur-A-Flex, Inc. *v.* Dy

defendants contend that the plaintiff's alleged failure to do so led the trial court to afford an overly broad scope of protection to the plaintiff's trade secrets in its misappropriation analysis. We conclude that the court correctly determined that the plaintiff had identified its trade secrets with sufficient particularity.[37]

The following additional procedural facts are relevant to our resolution of this claim. In its original complaint, the plaintiff alleged that "[t]he formula for Poly-Crete" was a trade secret entitled to protection under CUTSA. In its amended complaints, the plaintiff instead identified "[t]he processes and formulae for [the plaintiff's] products and research" as trade secrets.

In its responses to Knone and ECI's interrogatories that the plaintiff identify each process and formula that it claimed as a trade secret, the plaintiff listed approximately twenty separate trade secrets, all of which were related to the plaintiff's formula for Poly-Crete.[38] Krone and ECI filed a motion to compel, arguing that the plaintiff's responses failed to identify its trade secrets with "reasonable particularity . . . ." Following its review of the unredacted copy of the plaintiff's interrogatory responses, the trial court denied the motion to compel on the ground that the plaintiff had identified its trade secrets "with adequate specificity to inform the defendant[s] what it is that is alleged to have been misappropriated." At the conclusion of phase one of the trial, the court found that the plaintiff proved it owned the following trade secrets: the Poly-Crete resin and hardener formulas, the resin and hardener formulas for Dur-A-Glaze No. 4 and Dur-A-Glaze MVP, the formula for a "polyaspartic-imine resin," and the specific

---

[37] We address this claim because the issue is likely arise on remand if the trial court finds that the defendants had knowledge of and used the plaintiff's trade secrets.

[38] The plaintiff's responses to the interrogatories were ordered sealed by the trial court.

Dur-A-Flex, Inc. *v.* Dy

experiments performed and data related to the experiments undertaken to develop these products "as recorded in the company lab books . . . ."

"A person claiming rights in a trade secret bears the burden of defining the information for which protection is sought with sufficient definiteness to permit a court to apply the criteria for protection described in this [s]ection and to determine the fact of an appropriation." Restatement (Third), supra, § 39, comment (d), p. 430. Generally speaking, the particularity requirement ensures that a defendant and the court will have sufficient notice of "what constitutes [the] alleged trade secret." *StoneEagle Services, Inc.* v. *Gillman*, Docket No. 3:11-cv-2408-P, 2013 WL 12124328, *1 (N.D. Tex. August 19, 2013). Thus, the trade secret must be defined with sufficient particularity to put the court and the defendant on notice of what is claimed to have been misappropriated. The defendants have failed to demonstrate how the plaintiff's pleadings did not satisfy that requirement.

The plaintiff's original complaint identified the formula for Poly-Crete as its trade secret, and the amended complaints expanded that definition to include "[t]he processes and formulae for [the plaintiff's] products and research . . . ." The second definition, although significantly broader than the one provided in the original complaint, was limited by the immediately preceding paragraph, which alleged that, until his resignation, "Samet . . . was instrumental in the development of the processes and formulae for Poly-Crete, one of the plaintiff's most important proprietary products, and other products and formulae for dual-cure polyaspartic and other floor coating systems." In its responses to Krone and ECI's interrogatories, the plaintiff specified which formulas and processes it claimed as trade secrets, beginning with the formula for Poly-Crete. The additional formulas identified by the plaintiff in its responses include parts of the Poly-Crete formula, such

Dur-A-Flex, Inc. *v.* Dy

as the formula for the hardener. The plaintiff also identified various other aspects of the Poly-Crete formula and its manufacturing process, such as the amount of water in the resin formula, the additives in the resin, and the ratio of resin to hardener. Most of the trade secrets disclosed in the plaintiff's responses share a common theme. They are all part of or related to the formula for Poly-Crete, which the trial court found to be unique, noting that no one at trial disputed that the formula for Poly-Crete "can't be found anywhere except at [the plaintiff's factory]." The plaintiff disclosed one additional trade secret in its responses, consistent with its amended complaint, the formula for "polyaspartic amine product."

We conclude that the mere fact that the plaintiff refined its claim in the amended complaints to add one additional formula, for "dual-cure polyaspartic and other floor coating systems," and provided greater detail in its responses to Krone and ECI's interrogatories did not make the plaintiff's trade secret a "moving target," deprive the defendants of the information they needed to defend themselves, or prevent the trial court from managing the discovery process effectively and efficiently. To the contrary, the plaintiff's responses to Krone and ECI's interrogatories narrowed the scope of the plaintiff's trade secret claim by identifying which aspects of the Poly-Crete formula and its manufacturing process constituted alleged trade secrets and by limiting the plaintiff's claim of trade secret status as to "dual-cure polyaspartic and other floor coating systems" solely to the formula for "polyaspartic amine product."[39]

[39] We have reviewed and reject the defendants' remaining claims regarding this issue, including their claim that the plaintiff's purportedly inadequate definition somehow misled the trial court to find that they had used the plaintiff's trade secrets, despite the fact that they did not use the exact formula for Poly-Crete; their claim, which relies on *American Can Co.* v. *Mansukhani*, 742 F.2d 314 (7th Cir. 1984), that the trial court improperly applied the "substantially derived" standard to the formulas for ProKrete and ProSpartic; and their claim that "[t]he scope of protectable trade secret information in the lab books should have been limited to the precise data

349 Conn. 513 SEPTEMBER, 2024 583

Dur-A-Flex, Inc. *v.* Dy

D

We next address the defendants' claim that, if the trial court correctly determined that they misappropriated the plaintiff's trade secrets, it used an incorrect standard to determine the appropriate remedies. We agree.

The following additional facts are relevant to our resolution of this claim. In its memorandum of decision on liability, the trial court found that Samet used his knowledge of the plaintiff's trade secrets to "speed up the [development] process" for ProKrete and that, as a result, ProKrete was developed in "far less time" than Poly-Crete. The court also found that Samet's development of the formula for ProSpartic "was simply a matter of picking up . . . where he left off" on his work at the plaintiff, necessarily implying that Samet developed the formula for ProSpartic in less time than he would have without the misappropriation.

In a memorandum of law concerning damages that the defendants submitted to the trial court, they argued that the evidence presented at trial showed that "there was limited, if any, acceleration [of Samet's development of the formulas for ProKrete and ProSpartic] associated with [his] alleged use of [the plaintiff's] trade secrets."[40] They further argued, quoting the Restatement (Third) of Unfair Competition, that, if the court granted the plaintiff's request seeking recovery for the defen-

_____

recorded therein and should not have included [the] defendants' experience and observations."

[40] With respect to ProKrete, the defendants argued that the plaintiff's expert witness, Steven Peake, testified at trial that it would take him three to five years to develop cementitious urethane, and other evidence showed that it took Samet three years to develop a stable formula for ProKrete. Thus, according to the defendants, the head start period would be between zero and two years for that product. We note that the trial court found that it took Samet eight years to develop a stable formula for Poly-Crete. We express no opinion as to the length of the head start period but leave that determination to the trial court on remand.

Dur-A-Flex, Inc. *v.* Dy

dants' unjust enrichment caused by their misappropriation of the plaintiff's trade secrets, it should limit the damages to "the period of time that the information would have remained unavailable to the defendant[s] in the absence of the appropriation," known as the "head start" period. Restatement (Third), supra, § 45, comment (h), p. 519. The defendants also suggested that an injunction was not warranted because the head start period already had expired.

Although the trial court agreed that this theory might apply to the unlawful development of a product such as Indu-Crete, which did not substantially embody the plaintiff's trade secrets, the court disagreed that the theory applied to the development of ProKrete and Pro-Spartic, which did. According to the court, this was because the plaintiff's trade secrets did not merely give the defendants a head start on the development of Pro-Krete and ProSpartic; rather, the trade secrets were "something old that belonged to [the plaintiff] that Pro-Rez brought into blossom. Therefore, every time the [products were] sold, it violated [CUTSA]. The same is not true of [Indu-Crete]." The court ordered the defendants to disgorge all of their profits from the sale of products that were developed using the plaintiff's trade secrets for the years 2014 through 2021. See General Statutes § 35-53 (a) ("[i]n addition to or in lieu of injunctive relief . . . [a] complainant . . . may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss"). This amounted to $1.1 million for ProRez, $400,000 for Lipman, and $322,000 for Durafloor. The court also enjoined the defendants from manufacturing ProKrete and ProSpartic products until the trade secrets on which they were based ceased to exist. See General Statutes § 35-52 (a) ("[a]n injunction shall be terminated when the trade secret has ceased to exist, but the injunc-

Dur-A-Flex, Inc. *v.* Dy

tion may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation'').

In support of their argument that the trial court applied an incorrect standard when it ordered them to disgorge all of their profits and indefinitely enjoined them from manufacturing the products at issue, the defendants rely on comment (h) to § 45 of the Restatement (Third) of Unfair Competition, which provides in relevant part: ''Monetary remedies, whether measured by the loss to the plaintiff or the gain to the defendant, are appropriate only for the period of time that the information would have remained unavailable to the defendant in the absence of the appropriation. This period may be measured by the time it would have taken the defendant to obtain the information by proper means such as reverse engineering or independent development.'' Restatement (Third), supra, § 45, comment (h), pp. 519–20; see also id., reporter's note to comment (h), pp. 526–27 (citing cases). Similarly, with respect to injunctive relief, the Restatement (Third) provides that ''[t]he duration of [an] injunction . . . should be sufficient to deprive the defendant of any head start or other economic advantage attributable to the appropriation. In some cases, courts have issued injunctions for a specific period reflecting the time when the defendant could have acquired the information by proper means.'' Id., § 44, comment (f), pp. 504–505. Whether the trial court applied the correct legal standard is a question of law subject to plenary review. See, e.g., *Mirjavadi* v. *Vakilzadeh*, supra, 310 Conn. 183.

We agree with the defendants that the trial court appears to have been confused about how the ''head start'' and ''acceleration'' concepts apply to the crafting of relief for misappropriation claims. Specifically, the court reasoned that, if the person accused of misappro-

Dur-A-Flex, Inc. *v.* Dy

priation did not use the trade secret merely as a *starting point* to develop a new product but, instead, *substantially embodied* the trade secrets in the new product, the head start and acceleration concepts simply do not apply, and the person may be *permanently* enjoined from using the trade secret and required to disgorge *all* profits obtained through use of the trade secret.[41] We see nothing in the Restatement (Third) of Unfair Competition or the cases that it cites to support this proposition, which would be inconsistent with the dual policies underlying trade secrets law of promoting commercial morality and not unduly hindering free and open competition. See, e.g., *PepsiCo, Inc.* v. *Redmond,* 54 F.3d 1262, 1268 (7th Cir. 1995); see also Restatement (Third), supra, § 44, comment (c), p. 501 ("[t]hese competing interests are properly considered not only in defining the subject matter eligible for protection as a trade secret . . . but also in fashioning appropriate relief"). Moreover, under the court's reasoning, injunctive relief and damages could never be limited to the head start period because a person who creates a product that does not substantially derive from the trade secret cannot be held liable for misappropriation *at all.* See Restatement (Third), supra, § 40, comment (c), pp. 455–56.

Applying the "head start" concept when the trade secret is substantially embodied in the new product is also consistent with the language of § 35-52 (a), which provides in relevant part that "[a]n injunction shall be terminated when the trade secret has ceased to exist," and of § 35-53, which provides that a plaintiff "may recover for the unjust enrichment caused by the misappropriation . . . ." If the trade secret had not been

---

[41] The trial court also appears to have incorrectly believed that, if a defendant uses a trade secret to get a head start on the development of a new product, the court can award damages, even if the head start was not substantial. See footnote 11 of this opinion.

misappropriated, it *would have* ceased to exist at the point that the defendant would have been able to acquire the information by other proper means, and a damages award or injunctive relief that extended beyond that point could not be attributable to the misappropriation. See Restatement (Third), supra, § 44, comment (f), p. 503 ("the law of trade secrets does not afford protection against losses or gains that are not attributable to the defendant's appropriation").

We do not suggest that the trial court is required, in every case, to limit damages and injunctive relief to the head start period. There may be circumstances, which should be clearly explained by the trial court, in which awards that exceed that period are warranted. See, e.g., *Kilbarr Corp.* v. *Business Systems, Inc.*, 679 F. Supp. 422, 427 (D.N.J. 1988) (limitation of damages to head start period was not appropriate when defendant's appropriation effectively preempted market), aff'd, 869 F.2d 589 (3d Cir. 1989). There also may be cases in which the head start concept simply does not apply because the defendant would never have been able to develop the product independently. In the absence of such circumstances, we conclude that monetary and injunctive remedies for misappropriation "are appropriate only for the period of time that the information would have remained unavailable to the defendant in the absence of the appropriation."[42] Restatement (Third), supra, § 45, comment (h), p. 519. We conclude, therefore, that the trial court applied an incorrect standard when it determined that this principle did not apply because the defendants did not use the plaintiff's trade secrets as a starting point to develop something new. If the trial court concludes on remand that the defen-

---

[42] In addition, the defendant may be "liable for any development or reverse engineering costs saved as a result of the appropriation that are not otherwise accounted for through an award of the defendant's profits or other monetary relief." Restatement (Third), supra, § 45, comment (f), p. 518.

588 SEPTEMBER, 2024 349 Conn. 513

Dur-A-Flex, Inc. *v.* Dy

dants are liable for misappropriation, it must then determine the amount of damages and the extent of the injunctive relief, if any, applying the correct standard.

E

We finally address the defendants' claim that the injunctive relief granted by the trial court was impermissibly vague and restrictive. We disagree.

The following additional facts are relevant to our resolution of this claim. In its phase three memorandum of decision, the trial court ordered that "all defendants are enjoined from directly or indirectly manufacturing, selling, or otherwise distributing the ProKrete and Pro-Spartic labeled products in any essentially identical form to the current formulas contained in the record of this case. . . . The defendants are also enjoined . . . from directly or indirectly revealing the ingredients in the . . . Poly-Crete formula." The court further ordered that "the defendants may not directly or indirectly manufacture, sell, or otherwise distribute products using any [of the plaintiff's] trade secret[s] identified in this case."

Consistent with the general rules governing injunctive orders, an injunctive order relating to the misappropriation of trade secrets "should be sufficiently precise to give the defendant fair notice of the information that is encompassed within the terms of the injunction." Restatement (Third), supra, § 44, comment (c), p. 502. "When the trade secret is narrow in scope and closely related to publicly available information, the injunction should be carefully restricted to the contours of the trade secret in order to avoid encroachment on the public domain." Id., comment (d), p. 502. The scope and contours of an order of injunctive relief are subject to review for abuse of discretion. See, e.g., *Tomasso Bros.*, *Inc.* v. *October Twenty-Four, Inc.*, 230 Conn. 641, 648, 646 A.2d 133 (1994).

Dur-A-Flex, Inc. *v.* Dy

The defendants contend that the trial court's order prohibiting them from manufacturing, selling, or distributing any product made with a formula that has an "essentially identical form" as the current ProKrete formula is both vague—because it is extremely difficult to determine whether formulas are essentially identical—and impermissibly restrictive—"because it can be interpreted as enjoining the use of any similar variation of a product that is already chemically distinct from the trade secret formula at issue." The defendants further contend that the court's order prohibiting them from manufacturing, selling, or distributing products "using" any of the plaintiff's trade secrets is vague because of "the difficulty inherent in understanding what constitutes 'use' of another's trade secret. Without clarity on what conduct is or is not permitted, the defendants are effectively barred from practicing their trade."

Although we understand the difficulties inherent in determining whether formulas are sufficiently similar to support a finding that a trade secret has been used, those difficulties are simply unavoidable in this context. The defendants are effectively asking us to conclude that the principle that the *substantial use* of a trade secret constitutes misappropriation cannot be applied to their commercial activities. See, e.g., *Mangren Research & Development Corp.* v. *National Chemical Co.*, supra, 87 F.3d 944. We decline to do so and, therefore, reject this claim.

III

THE PLAINTIFF'S CLAIMS ON CROSS APPEAL

A

The plaintiff first claims that the trial court improperly limited the testimony of its damages expert. We take this opportunity to remind parties that it is their responsibility, not this court's, to clearly identify how

Dur-A-Flex, Inc. *v.* Dy

and where in the record the claim that the party is raising on appeal was preserved for review and where in the record the trial court's ruling on the claim may be found—a responsibility that has been neglected in several instances by all of the parties in the present case. Because the plaintiff has failed to identify where in the voluminous record the trial court's ruling on this issue can be found, and we have been unable to find the ruling, we decline to review this claim.

B

The plaintiff next claims that the trial court incorrectly determined that Samet's noncompete agreement was unenforceable for lack of adequate consideration.[43] We conclude that the case must be remanded for further proceedings to determine whether Samet received adequate consideration in exchange for executing the noncompete agreement and, if so, whether Samet breached the agreement.

As we previously explained, several years after hiring Samet as a chemist, the plaintiff required him to sign the noncompete agreement, which provided that he would not "disclose, divulge, communicate or use any confidential or proprietary business information or trade secrets" of the plaintiff or its customers during or after his employment and that he would not compete with the plaintiff for two years after his employment terminated. Samet was an at-will employee at the time. At trial, Samet claimed that the noncompete agreement was unenforceable because he had received no consideration for it. The plaintiff claimed that, to the contrary, Samet received consideration for the agreement because, when he resigned, he accepted the plaintiff's offer to continue to consult with the plaintiff in exchange for

_____

[43] None of the defendants participating in this appeal has taken a position on this issue, as it does not affect them.

Dur-A-Flex, Inc. *v.* Dy

compensation and that he orally reaffirmed the agreement at that time.

Relying on *Thoma* v. *Oxford Performance Materials, Inc.*, 153 Conn. App. 50, 100 A.3d 917 (2014), the trial court held that "a party giving nothing more than the status quo of continuing employment . . . offers no consideration [in] exchange for his promise, and the promise is, therefore, unenforceable." The court further noted that the plaintiff's owner, Smith, had testified that the compensation that Samet received when he resigned was "a charitable act" and that the plaintiff's vice president of strategy and business development, David Hughes, testified that the compensation was in exchange for Samet's agreeing to "help with transitional issues related to his departure." On the basis of this testimony, the court found that the severance payment to Samet was not consideration for the noncompete agreement. Accordingly, the court found that the noncompete agreement was not enforceable.

On appeal, the plaintiff contends that *Thoma* is distinguishable from the present case and that, under this court's decision in *Roessler* v. *Burwell*, 119 Conn. 289, 176 A.126 (1934), when employment is terminable at will, continued employment constitutes consideration for a noncompete agreement. The plaintiff further contends that the trial court incorrectly determined that the severance payment to Samet did not constitute consideration.

As the plaintiff points out, for years, the determination as to whether continued employment may be consideration for a noncompete agreement has been controlled by *Roessler*. In *Roessler*, the plaintiff, a business owner, agreed to continue employing the defendant, one of his salesmen, indefinitely in exchange for his promise not to compete with the plaintiff or to solicit his customers for one year after the defendant's

Dur-A-Flex, Inc. *v.* Dy

employment ended. Id., 290–91. Eventually, the defendant voluntarily left his position and went into business for himself selling similar products and seeking orders from the plaintiff's customers. Id., 291–92. The trial court subsequently granted an injunction enforcing the noncompete agreement. Id., 292. On appeal, this court affirmed the trial court's judgment, concluding that "[t]he underlying purpose of the defendant in entering into the agreement was to continue thereafter in the employment of the plaintiff at a mutually agreeable salary; the benefit offered him was such a continuance, in return for which the plaintiff was to receive his services and the benefit of the restrictive covenant in the agreement. The defendant received the benefit he sought in that he was continued in the [plaintiff's] employment [for] more than four years after the agreement was made, until he voluntarily left it. In such a situation, what is said in *Willetts* v. *Sun Mutual Ins. Co.*, 45 N.Y. 45, 47 [1871], is applicable: 'Though there be not mutual promises, yet if, before he calls for the fulfillment of the promise, the promisee do perform that, in consideration of his doing which the promise is made, there is a consideration for the agreement, and it can be enforced.' " *Roessler* v. *Burwell*, supra, 119 Conn. 293.

In the present case, none of the parties has asked this court to overturn or modify *Roessler*, and we will not consider its viability sua sponte. Although it was decided in a different era, its reasoning has long been followed by federal courts applying Connecticut law, the Appellate Court, and the Superior Court. See, e.g., *MacDermid, Inc.* v. *Selle*, 535 F. Supp. 2d 308, 316 (D. Conn. 2008) ("the Connecticut Supreme Court has long recognized that continued employment may suffice as adequate consideration to support a covenant in an at-will employment relationship"); *Schimenti Construction Co., LLC* v. *Schimenti*, 217 Conn. App. 224, 246,

Dur-A-Flex, Inc. *v.* Dy

288 A.3d 1038 (2023) (''[*Roessler*'s] holding that consideration in the form of continued employment for at-will employees can be sufficient to make enforceable a restrictive covenant agreed to by the parties at some point after the commencement of employment remains binding precedent''). Under *Roessler*, a promise of indefinite, continued employment for an at-will employee in exchange for the employee's promise not to compete constitutes adequate consideration to form an enforceable agreement.[44] See *Roessler* v. *Burwell*, supra, 119 Conn. 293. We conclude, therefore, that the trial court incorrectly determined that continued employment can *never* be consideration for a noncompete agreement.

We cannot say as a matter of law, however, that the plaintiff gave sufficient consideration to render the noncompete agreement enforceable. In *Roessler*, the plaintiff promised to employ the defendant '' 'indefinitely' '' in exchange for his promise not to compete. Id., 290–91. In the present case, on the other hand, the plaintiff did not explicitly promise Samet that it would continue to employ him for any particular period. Because the trial court failed to address this court's decision in *Roessler* and categorically rejected the notion that continued employment can ever suffice as consideration, it did not evaluate whether the noncompete agreement imposed an obligation on the plain-

---

[44] We note that the Superior Court at times has concluded otherwise and that the same language rejecting this principle appears in multiple decisions. See, e.g., *Artman* v. *Output Technologies Solutions Eastern Region, Inc.*, Docket No. CV-00-0595362-S, 2000 WL 992166, *3 (Conn. Super. June 30, 2000) (''[i]t is well settled law in Connecticut that continued employment is not consideration for a covenant not to compete entered into after the beginning of the employment''). Samet cited several of these cases in the trial court. These decisions, however, either fail to distinguish *Roessler* properly or fail to account for it altogether. See, e.g., *Fairfaxx Corp.* v. *Nickelson*, Superior Court, judicial district of Fairfield, Docket No. CV-99-036873-S (September 14, 2000) (28 Conn. L. Rptr. 162, 166–67) (finding at-will employee's noncompete agreement unenforceable for lack of consideration but omitting any discussion of *Roessler*).

Dur-A-Flex, Inc. *v.* Dy

tiff that would make the agreement enforceable.[45] Further proceedings are therefore necessary to determine whether the plaintiff provided adequate consideration.

As we explained, the trial court relied on *Thoma* to support its conclusion that the promise of continued employment to an at-will employee can never provide adequate consideration for a noncompete agreement. That case is distinguishable from the present case. In *Thoma*, the plaintiff and the defendant, her former employer, executed two agreements. *Thoma* v. *Oxford Performance Materials, Inc.*, supra, 153 Conn. App. 52–53. The first agreement included a noncompete provision and imposed conditions on the defendant's right to terminate the plaintiff's employment, thus altering the plaintiff's status as an at-will employee. Id. The second agreement included not only a noncompete provision but also a provision that the defendant could terminate the plaintiff's employment at any time without cause or notice. Id., 53–54. When the defendant terminated the plaintiff's employment, the plaintff brought an action alleging that the defendant had breached the first agreement by terminating her employment without notice, cause, or compensation. Id., 54. The trial court ruled that the defendant had breached the first agreement and that the second agreement was unenforceable because it was not supported by consideration. Id. The Appellate Court affirmed the trial court's judgment, con-

---

[45] We recognize that the noncompete agreement did not expressly require the plaintiff to employ Samet for any specific duration, and, therefore, it would appear that he continued to be an at-will employee after the agreement was executed. In addition, the agreement provided that it "constitute[d] the entire understanding and agreement" between the parties and that "[t]here [were] no other agreements, conditions or representations, oral or written, expressed or implied with regard thereto." It therefore seems unlikely that there was adequate consideration for the agreement. We are reluctant, however, to make that determination in the first instance without allowing the plaintiff an opportunity to present evidence to the contrary.

Dur-A-Flex, Inc. *v.* Dy

cluding that the second agreement required nothing of the defendant that it was not already contractually obligated to provide and therefore lacked consideration. Id., 52, 66, 68.

In the present case, because Samet was an at-will employee, the plaintiff's forbearance of its right to terminate his employment could be valid consideration if it altered his at-will status. Accordingly, a remand to the trial court to make that determination is necessary. If the trial court determines on remand that the noncompete agreement is enforceable, it must then determine whether Samet breached the agreement.

Finally, we disagree with the plaintiff's claim that the trial court incorrectly determined that the severance compensation that Samet received did not constitute consideration for the noncompete agreement. The court heard several contradictory explanations for why the plaintiff continued to pay Samet and to utilize his services after his resignation. After weighing the witnesses' credibility, the court determined that their testimony did not support the conclusion that the plaintiff compensated Samet in exchange for his assent to the noncompete agreement but, rather, that the plaintiff would have continued to pay him regardless of whether the agreement existed.

"[I]t is the exclusive province of the trier of fact to weigh conflicting testimony and [to] make determinations of credibility, crediting some, all or none of any given witness' testimony." (Internal quotation marks omitted.) *Wall Systems, Inc.* v. *Pompa*, 324 Conn. 718, 741, 154 A.3d 989 (2017). "It is not our role to reevaluate the credibility of witnesses or to overturn factual findings of a [trial] court unless they are clearly erroneous. . . . If there is any reasonable way that the [trier of fact] might have reconciled the conflicting testimony before [it], we may not disturb [its] [credibility determi-

Dur-A-Flex, Inc. *v.* Dy

nation].'' (Citation omitted; internal quotation marks omitted.) Id.

After reviewing the record, we are not "left with the definite and firm conviction that a mistake has been committed.'' (Internal quotation marks omitted.) *In re Jacob W.*, 330 Conn. 744, 770, 200 A.3d 1091 (2019). Accordingly, we will not disturb the trial court's conclusion that Samet's oral affirmation of the noncompete agreement did not render the agreement enforceable.

C

We next consider the plaintiff's claim that the trial court incorrectly determined that any common-law duty of confidentiality that Samet owed to the plaintiff was preempted by CUTSA. The plaintiff argues that certain proprietary information obtained by Samet during his employment falls outside the statutory definition of a trade secret but is nonetheless protected under his common-law duty of confidentiality. Specifically, the plaintiff contends that Samet had a common-law duty not to disclose "price lists, customer lists, identities of vendors, suppliers, raw material pricing, internal processes, and other company 'know-how.' " Thus, the issue that we must decide is whether the trial court correctly determined that § 35-57 (a), which provides that claims for the misappropriation of trade secrets are governed solely by CUTSA, precludes common-law claims arising from the misuse of confidential information by a former employee that does not rise to the level of a trade secret. We conclude that the two tiered system of liability that the plaintiff envisions—claims under CUTSA for misappropriation of trade secrets and common-law claims for misuse of other confidential information—is inconsistent with the preemption clause in § 35-57 (a).[46]

---

[46] We acknowledge the plaintiff's concern that this construction of the statute "essentially creates a system in which information is classified only as a protected 'trade secret' or unprotected 'general . . . knowledge.' " *Mortgage Specialists, Inc.* v. *Davey*, 153 N.H. 764, 777, 904 A.2d 652 (2006). CUTSA, however, does not preclude parties from protecting sensitive infor-

349 Conn. 513 SEPTEMBER, 2024 597

Dur-A-Flex, Inc. *v.* Dy

To determine whether the plaintiff's common-law claim is preempted, we must examine the provisions of CUTSA and the uniform version of that act as promulgated in other states. See Unif. Trade Secrets Act, § 8 (1979), 14 U.L.A. 827 (2021); see also General Statutes § 35-58. In so doing, "we are guided by the well established principle that [i]ssues of statutory construction raise questions of law, over which we exercise plenary review. . . . We are also guided by the plain meaning

mation contractually if it does not meet the statutory definition of a trade secret. See General Statutes § 35-57 (b) (1) ("[t]his chapter does not affect . . . [c]ontractual or other civil liability or relief that is not based upon misappropriation of a trade secret"). Nor does it foreclose actions in which the misuse of confidential information may be implicated but is not the wrong actually being alleged. For example, the Restatement (Third) of Unfair Competition acknowledges that it may be appropriate to impose liability for breach of confidence when interests other than protection of commercially valuable information are implicated—for example, the general duty of loyalty owed by a current employee to an employer or the duty of confidence in an attorney-client relationship. See Restatement (Third), supra, § 41, comment (c), pp. 470–71; see also id., § 42, comment (b), p. 479 (current employee's "duty of loyalty . . . incudes a duty not to disclose the employer's confidential information to others"). "[I]n the absence of interests justifying broader duties, the plaintiff should be required to demonstrate that the information qualifies for protection as a trade secret under the rule stated in § 39." Id., § 41, comment (c), p. 471. The Restatement (Third) recognizes that former employees have no duty of loyalty unless they are subject to an enforceable noncompete agreement and, therefore, are subject only to "the general rules prohibiting use or disclosure of another's *trade secrets* in breach of a duty of confidence." (Emphasis added.) Id., § 42, comment (b), p. 480.

In the present case, the gist of the plaintiff's claim is not that Samet breached his duty of loyalty while employed by the plaintiff, but that, "*following employment,*" he had a common-law duty "to keep information obtained from the plaintiff confidential, even if that information does not rise to the level of being a trade secret." We emphasize that our conclusion in the present case is limited to the precise claim that the plaintiff has raised, i.e., that, following his employment, Samet breached his common-law duty of confidentiality to the plaintiff by failing to keep confidential the plaintiff's commercially valuable information that did not rise to the level of a trade secret, and we do not address the question of whether other causes of action involving a breach of confidentiality or interference with business relations, but not focused primarily on the protection of commercially valuable information, are preempted.

Dur-A-Flex, Inc. *v.* Dy

rule for statutory construction.'' (Internal quotation marks omitted.) *Studer* v. *Studer*, 320 Conn. 483, 487, 131 A.3d 240 (2016); see also General Statutes § 1-2z.

In accordance with § 1-2z, we begin with the relevant statutory text. Section 35-57 (a) provides in relevant part that ''the provisions of this chapter supersede any conflicting tort, restitutionary, or other law of this state pertaining to civil liability for misappropriation of a trade secret.''[47] The term ''trade secret'' is defined in § 35-51 (d) as ''information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.''

In support of its claim that CUTSA does not preempt claims for the breach of the common-law duty of confidentiality by a former employee, the plaintiff cites this court's decision in *Allen Mfg. Co.* v. *Loika*, supra, 145 Conn. 509. In that case, we stated in dictum that ''knowledge acquired by an employee during his employment cannot be used for his own advantage to the injury of the employer during the employment; and *after the employment has ceased the employee remains subject to a duty not to use* trade secrets, or other *confidential information*, which he has acquired in the course of his employment, for his own benefit or that of a compet-

---

[47] As we indicated, § 35-57 (b) sets forth exceptions to § 35-57 (a). See General Statutes § 35-57 (b) (''[t]his chapter does not affect: (1) [c]ontractual or other civil liability or relief that is not based upon misappropriation of a trade secret; (2) criminal liability for misappropriation of a trade secret; or (3) the duty of any person or state or municipal agency to disclose information pursuant to section 1-210, sections 31-40j to 31-40p, inclusive, or subsection (c) of section 12-62, or wherever expressly provided by law'').

Dur-A-Flex, Inc. *v.* Dy

itor to the detriment of his former employer." (Emphasis added.) Id., 514; see also *Triangle Sheet Metal Works, Inc.* v. *Silver*, 154 Conn. 116, 125, 222 A.2d 220 (1966) (acknowledging "confidential relationship implicit in . . . employment," even after that employment has ended).[48]

For the following reasons, we conclude that our dictum in *Allen Mfg. Co.* suggesting that a former employee has a common-law duty to maintain the confidentiality of information that does not constitute a trade secret no longer reflects the law. First, the Restatement (Third) of Unfair Competition provides that, in the absence of an enforceable confidentiality or noncompete agreement,[49] a former employee is subject to only "the general rules prohibiting use or disclosure of another's *trade secrets* in breach of a duty of confidence." (Emphasis added.) Restatement (Third), supra, § 42, comment (b), p. 480; see also id., comment (d), p. 481 ("[in the absence of] an enforceable covenant not to compete, a former employee may utilize in competition with the former employer the general skills, knowledge, training, and experience acquired during the employment, but the employee remains obligated to refrain from using or disclosing the employer's *trade secrets*" (emphasis added));

---

[48] Because the information at issue in *Triangle Sheet Metal Works, Inc.* v. *Silver*, 154 Conn. 116, constituted trade secrets; see id., 126; any recognition of a broader common-law duty to maintain the confidentiality of information that does not rise to the level of a trade secret was dictum. Later, nonbinding decisions cited by the plaintiff include speculative language about the existence of a broader class of confidential information. See, e.g., *Nationwide Mutual Ins. Co.* v. *Bland*, Docket Nos. 399CV2005 (RNC), 399CV2006 (RNC), 399CV2007 (RNC), 2003 WL 23354137, *3 (D. Conn. March 30, 2003) (noting that information not entitled to trade secret protection "may be protected under Connecticut common law").

[49] CUTSA expressly allows parties to protect sensitive information contractually if it does not meet the statutory definition of a trade secret. See General Statutes § 35-57 (b) (1) ("[t]his chapter does not affect . . . [c]ontractual or other civil liability or relief that is not based upon misappropriation of a trade secret").

Dur-A-Flex, Inc. *v.* Dy

id. (''[a]n employer who is asserting rights in information against a former employee bears the burden of proving the existence and ownership of a *trade secret*'' (emphasis added)). Thus, former employees are treated differently under trade secrets law than current employees, who have a duty of loyalty not to compete with the employer that includes the ''duty to refrain from using *confidential information* acquired through the employment . . . .'' (Emphasis added.) Id., comment (b), p. 479; see also id. (''[w]hen it is alleged that a current employee has disclosed to third persons valuable information acquired in the course of the employment, the emphasis is properly on whether there has been a breach of loyalty by the employee and not on the character of the particular information'').[50] This distinction between current employees and former employees has its roots in the principle, to which we have referred repeatedly in this opinion, that ''[t]here is a strong public interest in preserving the freedom of [former] employees to market their talents and experience in order to earn a livelihood. The mobility of employees also promotes competition through the dissemination of useful skills and information.'' Id., 480.

In addition, our conclusion that, in the wake of the legislature's adoption of CUTSA, former employers owe no common-law duty to maintain the confidentiality of information that does not rise to the level of a trade secret finds support in decisions from other jurisdictions. See, e.g., *Composite Marine Propellers, Inc.* v. *Van Der Woude*, 962 F.2d 1263, 1265 (7th Cir. 1992) (concluding that Illinois' adoption of UTSA preempted

---

[50] The Restatement (Third) of Unfair Competition acknowledges that it may be appropriate to impose liability for breach of confidence when interests other than protection of commercially valuable information are implicated. See Restatement (Third), supra, § 41, comment (c), p. 471 (recognizing that the interests underlying ''the special duties of confidence owed in particular relationships such as attorney and client or doctor and patient'' are different from interest in protecting commercially valuable information).

Dur-A-Flex, Inc. *v.* Dy

common-law claim against former employee for misappropriation of information that did not constitute trade secret); *Thomas & Betts Corp.* v. *Panduit Corp.*, 108 F. Supp. 2d 968, 971 (N.D. Ill. 2000) (UTSA preempted common-law claims against former employees involving misuse of confidential information that did not constitute trade secrets); *Mortgage Specialists, Inc.* v. *Davey*, 153 N.H. 764, 776, 904 A.2d 652 (2006) ("the weight of authority among courts that have considered the preemption provision is that the history, purpose, and interpretation of the statutory scheme" support conclusion that all common-law claims against former employees based on wrongful use of confidential information are preempted by UTSA); see also General Statutes § 35-58 (CUTSA "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this chapter among states enacting it").

Finally, our conclusion finds support in the breadth of the statutory definition of "trade secret," which is far broader than many earlier common-law definitions. Compare General Statutes § 35-51 (d)[51] and Restatement (Third), supra, § 39, p. 425 ("[a] trade secret is any information that can be used in the operation of a business or other enterprise and that is sufficiently valuable and secret to afford an actual or potential economic advantage over others"), with *Thomas* v. *Best Mfg. Corp.*, 234 Ga. 787, 789, 218 S.E. 2d 68 (1975) (under Georgia common law, "trade secret" is defined as "a plan, process, tool, mechanism, or compound, known

[51] General Statutes § 35-51 (d) defines "trade secret" to mean "information, including a formula, pattern, compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

Dur-A-Flex, Inc. *v.* Dy

only to its owner and those of his employees to whom it must be confided in order to apply it to the uses intended'' (internal quotation marks omitted)); see also *Elm City Cheese Co.* v. *Federico*, supra, 251 Conn. 73, 74 (noting that ''the trial court found [the plaintiff's] business operations—from the specific sources and costs of its supplies, through the production of its cheese to the distribution of its product to three specific customers and the prices charged them—to be a protectable trade secret'' and concluding that § 35-51 (d) ''clearly provides that virtually every one of the individual components of [the plaintiff's] trade secret . . . could be considered a trade secret in and of itself'').[52] As the Restatement (Third) of Unfair Competition indicates, although, in some cases, courts have recognized tort liability for the unauthorized disclosure of confidential business information ineligible for trade secret protection, many of those cases ''rest on a narrow definition of 'trade secret' that excludes [nontechnical] information such as customer identities or information that is not subject to continuous, long-term use.'' Restatement (Third), supra, § 41, comment (c), pp. 470–71. ''Such information is now subsumed under the broader definition of 'trade secret' adopted in § 39 [of the Restatement (Third)].'' Id., p. 471. Given this broad definition, there is far less need to recognize a former employee's common-law duty of confidentiality in order to protect valuable commercial information than under narrower common-law definitions.

We conclude, therefore, that CUTSA preempts non-contractual civil claims against a former employee based on the acquisition, disclosure, or use of confiden-

_____

[52] The trial court in the present case made no factual finding that the ''price lists, customer lists, identities of vendors, suppliers, raw material pricing, internal processes, and other company 'know-how' '' allegedly misappropriated by Samet were or were not trade secrets, but the court invited the plaintiff to amend its complaint to restate its claims under CUTSA.

Dur-A-Flex, Inc. *v.* Dy

tial information that does not rise to the level of a trade secret. A noncontractual claim based on the misappropriation of commercial information by a former employee must be brought under CUTSA or not at all. Accordingly, we conclude that the trial court correctly determined that CUTSA preempted the plaintiff's claim that Samet had violated his common-law duty of confidentiality.

D

We next address the plaintiff's claim that the trial court improperly rendered summary judgment in favor of Lipman, Durafloor, and ProRez on the civil conspiracy claims. Specifically, the plaintiff contends that, if this court determines that knowledge of the plaintiff's trade secrets is required to establish misappropriation under § 35-51 (b) (2) (B) (iii), and if Lipman, Durafloor, and ProRez cannot be held liable for misappropriation because they had no such knowledge, but they did have knowledge that *Samet* had misappropriated the plaintiff trade secrets, then they should be held liable for civil conspiracy for "simply having agreed to join and assist Samet, Josh, and Lipman in their illegal acts." The plaintiff further contends that, "if liability could attach for civil conspiracy, but not misappropriation as the court has found, such a claim cannot possibly have been preempted [pursuant to § 35-57 (a)], especially when civil conspiracy is not an independent tort but, rather, a mechanism of extending liability to third parties for *another's* tort."[53] (Emphasis in original.) We assume for purposes of this opinion that, given the trial court's finding that Lipman, Durafloor, and ProRez knew that Samet misappropriated the plaintiff's trade secrets, if

_____
[53] The plaintiff does not cite any case law or authority in support of this claim, or engage in any further analysis of it in its principal brief to this court, but does so only in its reply brief. Although we ordinarily would not address a claim that is not adequately briefed until the reply brief, we do so here because the plaintiff cannot prevail.

Dur-A-Flex, Inc. *v.* Dy

they agreed to assist Samet in his unlawful acts of misappropriation or if they induced Samet to engage in them, which the trial court did not find, then the plaintiff would have a colorable civil conspiracy claim against them.[54] We conclude that the trial court correctly determined that CUTSA preempts any such claim.

To establish the elements of a civil action for conspiracy, a plaintiff must show: "(1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff." (Internal quotation marks omitted.) *Macomber* v. *Travelers Property & Casualty Corp.*, 277 Conn. 617, 635–36, 894 A.2d 240 (2006).

Section 35-57 (a) provides in relevant part that "the provisions of this chapter supersede any conflicting tort, restitutionary, or other law of this state pertaining to civil liability for misappropriation of a trade secret." The plaintiff contends that, because § 35-57 (a) preempts only claims "pertaining to civil liability for misappropriation of a trade secret," if we conclude that there is no such liability if the person accused of misappropriation did not have knowledge of the plaintiff's trade secrets—which we have concluded; see part II A of this

_____

[54] This claim is distinguishable from the plaintiff's claim that Krone, ECI, and Merrifield could be liable for civil conspiracy, which we have rejected; see part I B 2 of this opinion; because the trial court reasonably found that they did not know and had no reason to know that Samet had used the plaintiff's trade secrets.

To be sure, Lipman, Durafloor, and ProRez implicitly claim that they could not have known that Samet was using the plaintiff's trade secrets because, according to them, Samet *was not doing so*. They make no claim, however, that, if this court concludes that the trial court's finding that Samet used the plaintiff's trade secrets was not clearly erroneous, then Lipman and, through him, Durafloor and ProRez, did not know and could not reasonably have known of Samet's activities.

349 Conn. 513 SEPTEMBER, 2024 605

Dur-A-Flex, Inc. *v.* Dy

opinion; a claim of civil conspiracy against a person without such knowledge is not preempted. Whether § 35-57 (a) preempts the plaintiff's conspiracy claims is a question of statutory interpretation subject to plenary review governed by well established principles under § 1-2z. See, e.g., *Adesokan* v. *Bloomfield*, supra, 347 Conn. 425.

This court has not previously considered whether § 35-57 (a) preempts civil conspiracy claims involving a conspiracy to misappropriate trade secrets. We turn, therefore, to the case law of our sister states pertaining to the question of whether a claim for civil conspiracy that would not fall squarely within CUTSA's prohibition on misappropriation is preempted by the UTSA. See General Statutes § 35-58. Addressing the preemption issue, the court in *Hauck Mfg. Co.* v. *Astec Industries, Inc.*, 375 F. Supp. 2d 649 (E.D. Tenn. 2004), stated that, "[i]f a proven claim, whether in whole or in part, constitutes misappropriation of trade secret[s], it is that and that alone." Id., 658; see also id. ("if proof of a non-UTSA claim would also simultaneously establish a claim for misappropriation of trade secrets, it is preempted irrespective of whatever surplus elements or proof were necessary to establish it").[55]

The court in *Hauck Mfg. Co.* then applied this standard to the facts of the case before it. The court observed

---

[55] But see *Glynn* v. *EDO Corp.*, 641 F. Supp. 2d 476, 482 (D. Md. 2009) (under New Hampshire Uniform Trade Secrets Act, N.H. Rev. Stat. Ann. § 350-B et seq., "[i]f the elements of the claim require some allegation or factual showing in addition to that which forms the basis for a claim of misappropriation of a trade secret, the claim is not preempted" (internal quotation marks omitted)); *Powell Products, Inc.* v. *Marks*, 948 F. Supp. 1469, 1474 (D. Colo. 1996) ("[A] plaintiff may also bring claims that, although involving a trade secret misappropriation issue, include additional elements not necessary for a misappropriation claim under the UTSA. For example . . . [the] plaintiff alleges that [the] defendants conspired to misappropriate its trade secrets, which requires an agreement, which is not an element of a misappropriation claim under the UTSA. This claim . . . does not conflict with the UTSA and will not be preempted.").

Dur-A-Flex, Inc. *v.* Dy

that the plaintiff, Hauck Manufacturing Co. (Hauck), alleged that the defendants, Astec Industries, Inc. (Astec), and Bruce Irwin had "conspired, agreed, and planned that Irwin, while still a Hauck employee, would provide confidential information to Astec, in violation of his confidentiality and conflict of interest agreements, the duty of loyalty owed to Hauck, and the [UTSA] . . . . Thus, the object of the alleged conspiracy was to steal [Hauck's] trade secrets and other confidential information and the predicate torts were misappropriation of trade secret, breach of Irwin's duty of loyalty, and tortious interference with and unlawful procurement of breach of contract. Although at least one of the alleged predicate torts might not itself be preempted by the UTSA (tortious interference and/or unlawful procurement with respect to the conflict of interest agreement), [Hauck's] allegations clearly indicate the overriding object of the conspiracy was to disseminate [its] confidential and proprietary information. As such, [Hauck] effectively alleges Astec and Irwin conspired to acquire, disclose, or use [Hauck's] confidential and proprietary information by improper means (i.e., breach or inducement of a breach of a duty to maintain secrecy or limit use)." (Citation omitted; internal quotation marks omitted.) Id., 660. The court rejected Hauck's contention that the civil conspiracy was not preempted because it required the additional element of a common design, concluding that, under the standard that it had adopted, this was not relevant. Id., 660–61 The court concluded that, "[a]s plead[ed], [Hauck's] civil conspiracy claim is clearly based [on] alleged misappropriation of trade secrets and is therefore preempted." Id., 661; see also, e.g., *Unisource Worldwide, Inc.* v. *Swope*, 964 F. Supp. 2d 1050, 1061 (D. Ariz. 2013) (applying reasoning of court in *Hauck Mfg. Co.* in concluding that claim of civil conspiracy was preempted by Arizona Uniform Trade Secrets Act,

Dur-A-Flex, Inc. *v.* Dy

Ariz. Rev. Stat. § 44-401 et seq.); *Cardinal Health 414, Inc.* v. *Adams*, 582 F. Supp. 2d 967, 985 (M.D. Tenn. 2008) (agreeing with reasoning of court in *Hauck Mfg. Co.* in concluding that civil conspiracy claim was preempted by Tennessee Uniform Trade Secrets Act, Tenn. Code Ann. § 47-25-1701 et seq.); *Sal's Heating & Cooling Inc.* v. *BERS Acquisition Co.*, *LLC*, 192 N.E.3d 537, 548 (Ohio App.) (Ohio Uniform Trade Secrets Act, Ohio Rev. Code Ann. § 13333.61 et seq., preempted civil conspiracy claim when objective of conspiracy was misappropriation of trade secrets), appeal denied, 168 Ohio St. 3d 1419, 196 N.E.3d 856 (2022).

We agree with the court in *Hauck Mfg.* Co. that a claim that a defendant engaged in a civil conspiracy with the objective of misappropriating trade secrets is preempted by the UTSA. We acknowledge that, in the present case, unlike in *Hauck Mfg.* Co. the plaintiff contends that its civil conspiracy claims should not be preempted if it ultimately is unable to prove an element of its CUTSA claims, namely, Lipman's, Durafloor's, and ProRez' knowledge of its trade secrets, but we conclude that this distinction does not lead to a different result. To determine if a common-law claim is preempted by the UTSA, some courts "look to the [common-law] claims being proffered and examine if they differ qualitatively from an UTSA misappropriation of trade secrets claim." W. Parker & D. Justice, "The Differing Approaches to Preemption Under the Uniform Trade Secrets Act," 49 Tort Trial & Ins. Prac. L.J. 645, 657 (2014). The "agreement" element of a civil conspiracy claim alters and potentially dilutes the "knowledge" requirement of a misappropriation claim because a defendant could incur liability as a conspirator without possessing the actual or constructive knowledge required to incur liability under CUTSA.[56] Allowing a civil conspiracy claim

[56] As we explained in part II A of this opinion, there are circumstances in which the element of knowledge of a trade secret can be established by proving constructive knowledge arising from an agency relationship. For

Dur-A-Flex, Inc. *v.* Dy

in such situations would conflict with the scope of liability set forth in CUTSA. Cf. *BlueEarth Biofuels, LLC* v. *Hawaiian Electric Co.*, 123 Haw. 314, 327, 235 P.3d 310 (2010) (emphasizing "the uniformity and clarity that motivated the creation and passage of the [UTSA]" (internal quotation marks omitted)); id. (permitting common-law claims arising from trade secret misappropriation could permit "different results on matters such as the statute of limitations, punitive damages, [attorney's] fees and the like" (internal quotation marks omitted)).

In the absence of evidence that the alleged conspirator possessed actual or constructive knowledge of the trade secret, however, we conclude that CUTSA, which specifies that only those who have such knowledge may be held liable for misappropriation, preempts common-law claims involving the theft of trade secrets that dispense with that requirement. To conclude otherwise would result in a confusing and nonuniform patchwork of statutory and nonstatutory causes of action arising

example, if A and B agreed that B would misappropriate the trade secret of another so that A could sell the products that B manufactured using the trade secret, these and other circumstances might lead a finder of fact to conclude that B was acting as A's agent or that they could be found to be partners. See *Beckenstein* v. *Potter & Carrier, Inc.*, 191 Conn. 120, 133, 464 A.2d 6 (1983) ("the three elements required to show the existence of an agency relationship include: (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking" (internal quotation marks omitted)); see also *Abdo* v. *Abdulrahman*, 144 Conn. App. 574, 579, 74 A.3d 452 (2013) ("[a] partner is both principal and agent, principal as to himself and agent as to other partners" (internal quotation marks omitted)). A would therefore be deemed to have B's knowledge of the trade secret and could be held liable for misappropriation, even if A did not have actual knowledge of the trade secret. See, e.g., *E. Udolf, Inc.* v. *Aetna Casualty & Surety Co.*, 214 Conn. 741, 746, 573 A.2d 1211 (1990) ("knowledge of . . . an agent while acting within the scope of his authority and in reference to a matter over which his authority extends . . . is . . . knowledge of . . . the principal" (internal quotation marks omitted)).

Dur-A-Flex, Inc. *v.* Dy

from the misappropriation of trade secrets, which is the very situation that the preemption provision is intended to prevent.

The objective of the civil conspiracy alleged by the plaintiff in the present case was the misappropriation of the plaintiff's trade secrets. We conclude, therefore, that its civil conspiracy claims are preempted by § 35-57 (a).

E

We next address the plaintiff's claim that the trial court incorrectly concluded that Samet, Josh, Lipman, Durafloor, and ProRez did not act maliciously in misappropriating the plaintiff's trade secret, and, therefore, the plaintiff was not entitled to punitive damages and attorney's fees pursuant to § 35-53 (b).[57] We disagree.[58]

The following additional facts are relevant to our resolution of this claim. The trial court found that, before trial, Samet engaged in what the court characterized as "repeatedly obscene and offensive behavior at his deposition" by the plaintiff. The court also characterized Lipman as being "disaffected" with the plaintiff and found that he had "stoked [Samet's] dislike for what he perceived as the [plaintiff's] harshening regime."

After the court found Samet, Josh, Lipman, Durafloor, and ProRez liable for misappropriation, the plaintiff requested that the trial court award punitive damages and attorney's fees pursuant to § 35-53 (b) because they had acted maliciously in misappropriating its trade

---

[57] General Statutes § 35-53 (b) provides: "In any action brought pursuant to subsection (a) of this section, if the court finds wilful and malicious misappropriation, the court may award punitive damages in an amount not exceeding twice any award made under subsection (a) and may award reasonable attorney's fees to the prevailing party."

[58] We address this claim because the issue is likely to arise on remand if the trial court determines that Lipman, Durafloor, and ProRez had knowledge of and used the plaintiff's trade secrets.

Dur-A-Flex, Inc. *v.* Dy

secrets. The court denied the request, concluding that, although Samet and Lipman "may not have liked some people at [the plaintiff]," their main motivation for misappropriating the plaintiff's trade secrets was to make money.

The plaintiff contends on appeal that the trial court improperly denied its request for punitive damages and attorney's fees because the defendants "in any trade secret misappropriation case will nearly always have a primary purpose to benefit themselves financially. The court's ruling here—to minimize or disregard the defendants' malice in light of their primary profit motive— would render § 35-53 (b) meaningless."

"The decision to enter sanctions . . . is a matter within the sound discretion of the trial court. . . . In reviewing a claim that this discretion has been abused the unquestioned rule is that great weight is due to the action of the trial court and every reasonable presumption should be given in favor of its correctness." (Internal quotation marks omitted.) *D'Ascanio* v. *Toyota Industries Corp.*, supra, 309 Conn. 671.

This court has held that an award pursuant to § 35- 53 (b) is appropriate when the defendant "misappropriated a trade secret with the intent to injure the owner of the trade secret." (Emphasis omitted.) *Lydall, Inc.* v. *Ruschmeyer*, supra, 282 Conn. 245-46; see also *Elm City Cheese Co.* v. *Federico*, supra, 251 Conn. 92–93 (award pursuant to § 35-53 (b) was appropriate when evidence demonstrated that defendant was set "on a course for [the plaintiff's] demise rather than to enter into fair competition" and there was evidence of defendant's animosity toward plaintiff (internal quotation marks omitted)).

We conclude that the trial court's finding that Samet and Lipman disliked the plaintiff does not compel the conclusion that they were motivated to misappropriate

Dur-A-Flex, Inc. *v.* Dy

its trade secrets by a desire to injure the plaintiff rather than a desire to make money. Based on the existing record, there is no compelling evidence that any of the defendants in the present case had such an intent, and, in any event, it would be entirely the prerogative of the trial court to so find. We therefore conclude that the trial court did not abuse its discretion when it denied the plaintiff's request for punitive damages and attorney's fees pursuant to § 35-53 (b).

## IV

## SUMMARY

In summary, we conclude that the trial court incorrectly determined that the plaintiff was not required to establish that Lipman and, through him, Durafloor and ProRez, had knowledge of the plaintiff's trade secrets to establish the elements of § 35-51 (b) (2) (B) (iii). The judgment as to those defendants must therefore be reversed and the case remanded to the trial court for a new trial limited to the issue of whether they had knowledge of the plaintiff's trade secrets and, if so, whether they used that knowledge to develop or manufacture ProKrete and ProSpartic. We also conclude that the trial court applied an incorrect standard when it crafted its orders of monetary and injunctive relief as to those defendants. If the trial court determines on remand that they had knowledge of and used the plaintiff's trade secrets, it then must determine the appropriate relief under the correct standard. Finally, we conclude that the trial court incorrectly determined that the noncompete agreement was unenforceable because continued employment can never constitute consideration for a noncompete agreement. The judgment with respect to the breach of the noncompete agreement claim must therefore be reversed, and the trial court, on remand, must determine whether there was sufficient consideration for Samet's noncompete agreement and,

if so, whether he breached the agreement. We affirm the trial court's judgment in all other respects.

The judgment is reversed with respect to the misappropriation claims against Lipman, Durafloor, and Pro-Rez and the breach of contract claim against Samet, and the case is remanded for further proceedings in accordance with the preceding paragraph; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.

————————————————